[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10003

_____

PATHMANATHAN JATHURSAN,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

Agency No. A201-411-961

_____

Before JILL PRYOR, NEWSOM, and MARCUS, Circuit Judges.

JILL PRYOR, Circuit Judge:

Pathmanathan Jathursan, a native and citizen of Sri Lanka, seeks review of the Board of Immigration Appeals' ("BIA") final order affirming the immigration judge's denial of his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). The BIA found no clear error in the immigration judge's findings that Jathursan failed to establish (1) past persecution on account of a protected ground, (2) a well-founded fear of future persecution on account of a protected ground, or (3) that he would more likely than not be tortured in the event he returned to Sri Lanka.

Following oral argument, we grant Jathursan's petition for review in part, vacate the BIA's order in part, and remand to the BIA for further consideration of his asylum and withholding-of-removal claims based on his fear of future persecution as a Tamil failed asylum seeker. We also vacate and remand on the BIA's denial of relief under CAT. We deny the petition on his claims for asylum and withholding of removal based on past persecution, however, because substantial evidence supported the BIA's denial of relief on that ground.

## I.

Jathursan, a native citizen of Sri Lanka, entered the United States without inspection in 2018. He was apprehended by Department of Homeland Security ("DHS") patrol officers and expressed a fear of returning to Sri Lanka. After conducting a credible fear interview, DHS determined that Jathursan had a credible fear of persecution in Sri Lanka. DHS issued Jathursan a notice to appear, charging him with being removable under the Immigration and Naturalization Act. Jathursan conceded he was removable as charged.

During his removal proceedings, Jathursan applied for asylum, withholding of removal, and CAT protection. He argued he had suffered past persecution and had a well-founded fear of future persecution in connection with a statutorily protected ground. The protected grounds Jathursan claimed were his Tamil race and/or ethnicity,[1] his imputed political opinion as a supporter of the Liberation Tigers of Tamil Eelam ("LTTE"), his imputed membership in the LTTE through his brother, and his status as a Tamil failed asylum seeker.

---

[1] It is unclear from the record whether Jathursan wishes us to view "Tamil" as a race or as an ethnicity. In the record he referred to it as both. The immigration judge referred to Tamil as both a race and an ethnicity. The BIA referred to it as an ethnicity. Whether Tamil is a race or an ethnicity makes no difference to our decision, however.

For context, we briefly discuss the groups Jathursan refer-ences. The LTTE was a Tamil[2] separatist group in Sri Lanka that fought against the Sinhalese-dominated government in a decades-long civil war. The LTTE sought to create an independent state for the Tamil minority in Sri Lanka. Although the LTTE officially lost the war in 2009, civil unrest continues in Sri Lanka. The record re-flects that even after the war, persons suspected of having ties to the LTTE have been beaten, tortured, and raped. The record fur-ther suggests that much of the violence is carried out by the Elam People's Democratic Party ("EPDP"), a paramilitary group that op-erates with the tacit consent of the Sri Lankan government.

In a hearing before the immigration judge, Jathursan testi-fied about encounters he had with the EPDP. He described one oc-casion in which the EPDP stopped him, demanded his money and motorcycle, and severely beat him. He testified about another in-stance in which he was abducted by the EPDP and detained at its camp for three days. During the three days, Jathursan testified, he was beaten, his hands and legs were tied together, and an iron rod was forced through his rectum. He was hospitalized for three days following his abduction. He testified that he reported the EPDP en-counters to the police, who did nothing to protect him or punish the wrongdoers.

---

[2] The record informs us that "Tamils speak a different language and are largely Hindu, unlike the largely Buddhist Sinhalese majority" in Sri Lanka. AR at 325.

Jathursan testified that he feared persecution from the Sri Lankan army as well. He described an incident in which the Sri Lankan army soldiers—without any apparent EPDP affiliation—approached him at his motor-vehicle repair shop, demanded his services, and refused to pay. In his credible fear interview, Jathursan described other instances when the Sri Lankan army came to his place of business and demanded free merchandise. According to Jathursan, the EPDP and Sri Lankan army work alongside one another to persecute Tamils.

Apart from the abuse he suffered in the past, Jathursan testified, he feared that the EPDP and Sri Lankan army would persecute him in the future based on his status as a Tamil failed asylum seeker. He explained that, because he lacks a passport,[3] government forces in Sri Lanka would know that he sought asylum elsewhere. He testified that the EPDP and Sri Lankan army "would know that [he] would have said bad things" about the situation in Sri Lanka and would seek retribution against him. AR at 122–23.[4] Returned asylum seekers, Jathursan contended, "are perceived as LTT[E] supporters." *Id.* at 98.

Jathursan also submitted documentary evidence in support of his claim that the government persecuted Tamil failed asylum

---

[3] Jathursan testified that he lost his passport during his journey to the United States.

[4] "AR" refers to the administrative record.

seekers. These exhibits included news articles detailing the torture Tamils face when they return to Sri Lanka after their unsuccessful asylum applications in other countries. One article, for example, quoted a member of the Tamil Refugee Council, who proclaimed that it was "definitely not safe" for Tamil failed asylum seekers to return to Sri Lanka because they would likely be tortured upon their return. *Id.* at 435 (internal quotation marks omitted). Another article reported that Tamil failed asylum seekers who were deported from Australia faced "unthinkable sexual abuse and torture" condoned by the "highest levels of Sri Lankan governance." *Id.* at 438 (internal quotation marks omitted). That article described the ordeal of a Tamil man who was sent back to Sri Lanka:

> After months of monitoring by Sri Lankan security forces he was abducted and taken to a secret location. He says that for more than two months, he was tortured, including having his fingernails torn out and being hung upside down and beaten. He was accused of being associated with the defeated Tamil Tigers.

*Id.* (internal quotation marks omitted).

After the hearing, the immigration judge found Jathursan credible but denied him relief. As to his asylum and withholding-of-removal claims based on past persecution, the immigration judge found that Jathursan had not shown a sufficient nexus between his past incidents of persecution and a protected ground, concluding instead that the Sri Lankan army and the EPDP had been motivated by pecuniary gain.

As to Jathursan's asylum and withholding-of-removal claims based on a well-founded fear of future persecution, the immigration judge again found that Jathursan failed to show a nexus between his well-founded fear and a protected ground. Despite acknowledging that one of Jathursan's claimed protected grounds was his status as a "Tamil failed asylum seeker[]," *id.* at 39, the immigration judge, without explanation, considered only Jathursan's status as a general "returned asylum seeker." *Id.* at 42. The immigration judge ruled that Jathursan's proposed group of "returned asylum seekers" was not a cognizable social group because it "lack[ed] particularity and social distinction." *Id.*

After denying Jathursan's asylum claim, the immigration judge turned to his claim for withholding of removal. The immigration judge denied Jathursan withholding of removal because it "naturally follow[ed]" from the denial of asylum that Jathursan "c[ould not] meet the higher burden of proof for withholding of removal." *Id.* at 44.

The immigration judge next disposed of Jathursan's CAT claim. Although there was "ample evidence that the Sri Lankan government has committed human rights violations against Tamils in the past," the immigration judge found that "there [was] insufficient evidence to show that [Jathursan] would more likely than not be tortured" in the future. *Id.* Because Jathursan had not shown "specific grounds that he will personally be at risk of torture," the immigration judge concluded that he was ineligible for CAT protection. *Id.*

Jathursan appealed to the BIA, which affirmed the immigration judge's decision and dismissed Jathursan's appeal. The BIA determined that the "totality of the record" supported the immigration judge's finding that Jathursan's assailants were motivated by financial gain—not by any protected ground—when they assaulted Jathursan. *Id.* at 4. As to Jathursan's status as a Tamil failed asylum seeker, the BIA did something curious—it imputed a finding to the immigration judge that the immigration judge did not make. The BIA stated that it "*agree*[*d*] with the [i]mmigration [j]udge that the record evidence does not establish an objectively reasonable fear of persecution . . . based on Tamil ethnicity, having sought asylum, *or both*." *Id.* (emphases added).

As to Jathursan's CAT claim, the BIA "d[id] not discern error in the [i]mmigration [j]udge's finding that [Jathursan] is not similarly situated to" the Tamil Sri Lankans whose torture was detailed in the exhibits attached to his application. *Id.* at 5. The BIA reasoned that "[m]uch of the documentary evidence addressing torture of Tamils relates to detainees." *Id.* The BIA observed that Jathursan "ha[d] not previously been detained by the government, and ha[d] not shown a clear probability of being detained and tortured in the future." *Id.* Nowhere in its discussion of this issue did the BIA mention Jathursan's three-day abduction and detention at the hands of the EPDP.

Jathursan now petitions this Court for review.

## II.

We review the BIA's decision only, except where, as in this case, the BIA expressly adopted or agreed with the immigration judge's decision. *Tang v. U.S. Att'y Gen.,* 578 F.3d 1270, 1275 (11th Cir. 2009). We review factual findings under the substantial evidence test and legal conclusions *de novo. Lopez v. U.S. Att'y Gen.,* 914 F.3d 1292, 1297 (11th Cir. 2019). Under the substantial evidence test, we will not disturb an immigration judge's factual findings so long as they are "supported by reasonable, substantial, and proba- tive evidence on the record considered as a whole." *Id.* (internal quotation marks omitted). We will reverse "factual findings only if the record compels reversal, and the mere fact that the record may support a contrary conclusion is insufficient to justify reversal." *Id.*

But to enable our review, the BIA must first extend "rea- soned consideration" to the petitioner's claims. *Ali v. U.S. Att'y Gen.,* 931 F.3d 1327, 1333 (11th Cir. 2019). "To determine whether the Board gave reasoned consideration to a petition, we inquire only whether the Board considered the issues raised and an- nounced its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Perez-Guerrero v. U.S. Att'y Gen.,* 717 F.3d 1224, 1232 (11th Cir. 2013) (alterations adopted) (internal quotation marks omitted). Some indications that the BIA failed to give reasoned consideration include when the BIA "misstates the contents of the record, fails to adequately explain its rejection of logical conclusions, or provides justifications for its decision which are unreasonable and which do

not respond to any arguments in the record." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016). When the BIA fails to give reasoned consideration to a petitioner's claims, we remand those claims. *Id.*

## III.

Jathursan argues that the BIA erred in its analysis of his asylum and withholding-of-removal claims in light of his past persecution. He also argues that the BIA failed to consider his asylum and withholding-of-removal claims based on his well-founded fear of future persecution as a Tamil failed asylum seeker. Finally, Jathursan argues that the BIA erred in its analysis of his CAT claim. We address each of these arguments in turn.

**A.     Substantial Evidence Supported the BIA's Determination that Jathursan Failed to Show Past Persecution in Connection with a Protected Ground.**

Jathursan is not entitled to relief based on his claims of past persecution. "To establish asylum based on past persecution, the applicant must prove (1) that [he] was persecuted, and (2) that the persecution was on account of a protected ground." *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007) (emphasis omitted) (internal quotation marks omitted). Whether a petitioner has established a sufficient nexus between persecution and a statutorily protected ground is a question of fact and therefore reviewed under the substantial evidence test. *See Perez-Senteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). On this issue, the BIA adopted the immigration judge's reasoning, so

we look to the immigration judge's decision. *Tang,* 578 F.3d at 1275.

The immigration judge acknowledged that Jathursan suffered "prior instances of harm" but found that he had not shown a sufficient nexus between these instances and a protected ground. AR at 40. Substantial evidence supported the immigration judge's conclusion. Jathursan's testimony reflected that each time he was harassed by the EPDP or Sri Lankan army soldiers, his persecutors had a financial motive. For example, he testified that following his three-day abduction by the EPDP, his assailants demanded money from him. When EPDP members approached Jathursan for the second time while he was on his motorcycle, the EPDP members demanded money again. And when Sri Lankan army soldiers approached Jathursan at his motor-vehicle repair shop, they demanded service without payment. Although the record contains evidence that the EPDP mentioned they suspected Jathursan of LTTE sympathies this is not enough to compel a reversal of the immigration judge's finding that Jathursan did not establish a sufficient nexus between these incidents and a protected ground. Thus, we deny Jathursan's petition for review of the determination that he is not entitled to asylum based on past persecution.

Because Jathursan has not met his burden to show he is entitled to asylum relief based on past persecution, he cannot satisfy the higher burden necessary to show that he is entitled to withholding-of-removal based on past persecution. *See Rivera v. U.S. Att'y Gen.*, 487 F.3d 815, 820–21 (11th Cir. 2007). Consequently, we also

deny Jathursan's petition for withholding of removal insofar as he based that claim on instances of past persecution.

**B.    The BIA Failed to Give Reasoned Consideration to Jathursan's Evidence Showing a Well-founded Fear of Future Persecution in Support of His Asylum Claim.**

The BIA failed to give reasoned consideration to Jathursan's claim that as a Tamil failed asylum seeker, he had a well-founded fear of future persecution. "To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must prove (1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground." *Sanchez Jimenez*, 492 F.3d at 1232 (emphasis omitted) (internal quotation marks omitted). "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution. In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." *Id.* (quotations and internal citation omitted).

An applicant also may demonstrate a well-founded fear of future persecution by showing that (1) he would be singled out for persecution if returned to his country or (2) there is a pattern or practice of persecution against persons similarly situated to the applicant on account of a protected ground in the applicant's home country. *See Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1289–90 (11th Cir. 2020). Jathursan maintains that there was ample evidence in the record to show a pattern or practice of persecution of

20-10003               Opinion of the Court                13

Tamil failed asylum seekers who are returned to Sri Lanka. He argues that the BIA failed to give reasoned consideration to that evidence.[5] We agree.

Although reasoned consideration is not a demanding standard, it is not a meaningless one. The BIA fails to give reasoned consideration when it, among other things, "misstates the contents of the record." *See Jeune*, 810 F.3d at 803. The BIA misstated the

_____

[5] The government contends that Jathursan failed to exhaust his argument that the immigration judge never considered his asylum claim based on his status as a Tamil failed asylum seeker. We disagree with the government. To satisfy the exhaustion requirement, a petitioner must raise the "core issue" of an argument to the BIA. *Jeune*, 810 F.3d at 800. A petitioner is not required to "use precise legal terminology or provide well-developed arguments" to satisfy this requirement. *Id.* (internal quotation marks omitted). Rather, the petitioner must "provide information sufficient to enable the BIA to review and correct any errors below." *Id.* (internal quotation marks omitted). "This is not a stringent requirement." *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015).

In his brief before the BIA, Jathursan discussed his fear of returning to Sri Lanka as a failed asylum seeker in conjunction with his arguments about how Tamils are treated in Sri Lanka. He also raised "his status as a failed asylum seeker and as a Tamil" in his notice of appeal to the BIA. AR at 52. He argued to the BIA that the "[i]mmigration [j]udge[] fail[ed] to analyze his claim for asylum cumulatively/in conjunction with each factual predicate," meaning he wanted the immigration judge to consider his claimed statutorily protected grounds in combination with each other. *Id.* at 17. Further, the BIA addressed Jathursan's status as a Tamil failed asylum seeker, which belies the government's position that he failed to raise this issue. In sum, Jathursan raised the core issue of his status as a Tamil failed asylum seeker with the BIA and thus satisfied the exhaustion requirement.

14                    Opinion of the Court                    20-10003

record in this case when it wrote that the immigration judge made a finding concerning Jathursan's status as a Tamil failed asylum seeker. No such finding was made.[6]

To be sure, the immigration judge noted at the beginning of his decision that "Tamil failed asylum seekers" was one of the protected grounds Jathursan raised in his asylum application. AR at 39 (internal quotation marks omitted). Yet in his analysis the immigration judge focused exclusively on Jathursan's general classification as a "returned asylum seeker[]." *Id.* at 42 (internal quotation marks omitted). Nothing in the immigration judge's analysis indicated that he considered what he had earlier identified as Jathursan's claimed particular social group: *Tamil* failed asylum seekers.

Moreover, Jathursan's evidence—which the immigration judge did not discuss or acknowledge—supported his claim that Tamil failed asylum seekers face persecution in Sri Lanka. For example, one article indicated that "Tamil asylum seekers have been regularly tortured" and face "sexual violence" when they return to

---

[6] The BIA cannot perform *de novo* review of factual issues the immigration judge did not decide. 8 C.F.R. § 1003.1(d)(3); *see also Zhou Hua Zhu v. U.S. Att'y Gen.*, 703 F.3d 1303, 1308 (11th Cir. 2013) ("The regulation forbids the BIA from independently engaging in fact-finding and requires it to apply a clear error standard to IJs' factual findings."). Instead, the BIA reviews the immigration judge's findings of fact under a "clearly erroneous" standard. 8 C.F.R. § 1003.1(d)(3). Given the contours of the BIA's appellate jurisdiction, there is no way the BIA could have engaged in independent factfinding to address Jathursan's status as a Tamil failed asylum seeker.

Sri Lanka. *Id.* at 315. A second article echoed those sentiments, detailing how "mostly Tamil[]" failed asylum seekers were "picked up, . . . detained by security forces [and] tortured, in some cases sexually." *Id.* at 436. A third article described the ordeal of a Tamil failed asylum seeker who was monitored for two months by Sri Lankan security forces, abducted, taken to a secret location, and tortured, including "having his fingernails torn out and being hung upside down and beaten." *Id.* at 438.

Because the BIA wrote that the immigration judge made a finding based on Jathursan's status as a Tamil failed asylum seeker, and the immigration judge made no such finding, we must grant the petition in part and remand the issue to the BIA for want of reasoned consideration.

### C.    The BIA Failed to Give Reasoned Consideration to Jathursan's Withholding-of-Removal Claim.

Our conclusion on Jathursan's asylum claim carries implications for Jathursan's withholding-of-removal claim. "There are separate but related standards for evaluating requests" for asylum and withholding of removal. *Rivera*, 487 F.3d at 820. "To be entitled to withholding of removal, the petitioner[] must meet a higher evidentiary threshold than the well-founded fear standard for asylum." *Id.* (internal quotation marks omitted). Specifically, the petitioner must establish that he or she would "more likely than not" be persecuted on account of a protected ground. *Id.* at 820–21 (internal quotation marks omitted). "More likely than not" is a higher standard than the "well-founded fear" standard. *Id.*

Here, the immigration judge did not discuss Jathursan's withholding-of-removal claim. Instead, the immigration judge noted that because Jathursan failed "to satisfy the lower burden of proof for asylum," he could not meet the higher burden of proof for withholding of removal. AR at 44. This is ordinarily an efficient way of disposing of a withholding-of-removal claim, *see Rivera*, 487 F.3d at 821, but it no longer works here. In light of our determination that the BIA did not give reasoned consideration to Jathursan's status as a Tamil failed asylum seeker, we also must conclude that the BIA failed to give reasoned consideration to Jathursan's withholding-of-removal claim. *Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1368–69 (11th Cir. 2011) (remanding withholding-of-removal claim for lack of reasoned consideration). This claim, too, requires us to remand.

## D.    The BIA Failed to Give Reasoned Consideration to Jathursan's CAT Claim.

We now address Jathursan's CAT claim. To qualify for protection under the Convention Against Torture, the applicant must establish that he will more likely than not be tortured in the country of removal. *Cadet v. Bulger*, 377 F.3d 1173, 1180 (11th Cir. 2004). "Torture" is a term of art that refers to:

> [A]ny act by which severe pain or suffering, whether physical or mental, [that] is intentionally inflicted on a person . . . for any reason based on discrimination of any kind, when such pain or suffering is inflicted by, or at the instigation of or with the consent or

acquiescence of a public official acting in an official
capacity or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). "'In assessing whether it is more likely than
not that an applicant would be tortured in the proposed country of
removal, *all evidence relevant to the possibility of future torture
shall be considered.'" Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315,
1326 (11th Cir. 2007) (emphasis in original) (quoting 8 C.F.R.
§ 208.16(c)(3)). We must remand when the BIA "flatly ignores the
grounds presented by the petitioner" or otherwise fails to give rea-
soned consideration to a petitioner's claim for CAT relief. *Id.*

We conclude that the BIA failed to give reasoned considera-
tion to Jathursan's CAT claim. The BIA acknowledged that the
abuse Jathursan endured was "severe enough to constitute tor-
ture." AR at 5. But even assuming that Jathursan had been tortured,
the BIA reasoned, there was no clear error in the immigration
judge's finding that Jathursan failed to establish it was "more likely
than not" that he would be "tortured in the future." *Id.* The BIA
predicated its decision on the fact that the documentary evidence
submitted by Jathursan involved Tamil *detainees*. Because
Jathursan "has not previously been detained by the government,"
the BIA concluded there was no "clear probability" that Jathursan
would be "detained and tortured in the future." *Id.*

The BIA misstated the record on this point. When it came
to its CAT analysis, the BIA ignored the incident in which Jathursan
was detained by the EPDP for three days. During the three days,
Jathursan was beaten, his hands and legs were tied together, and an

iron rod was forced through his rectum. To be sure, the EPDP's treatment of Jathursan could not be considered torture under CAT unless the EPDP acted with "the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). But Jathursan argued and presented evidence that the EPDP works with the consent of the Sri Lankan government. The BIA did not address that argument or evidence. Moreover, the BIA observed that "the [i]mmigration [j]udge did not make adequate findings on whether that mistreatment was inflicted with the consent or acquiescence of a public official." AR at 5. Thus, by its own admission, the BIA was unable to consider whether Jathursan would be tortured in the future.

Further, the BIA misstated other evidence in the record. The BIA characterized Jathursan's evidence as indicating that "politically active" Tamils are subjected to torture—the implication being that Jathursan would not be tortured because he was not politically active. *Id.* Read in context, we think the BIA's reference to political activity was to the LTTE.

The BIA's characterization was inaccurate because the evidence showed that non-politically active Tamils, too, are tortured in Sri Lanka. One article told the tale of torture victims who never worked for the LTTE who "were abducted at home or off the streets by men in white or green vans" and were "tortured for days or weeks or months." *Id.* at 324. Another article observed that the "Tamil community" bore the brunt of the "State's well-oiled torture apparatus." *Id.* at 331. Without reference to the LTTE, or

political affiliation of any kind, the article reported that Tamils were beaten with sticks, asphyxiated with plastic bags, drenched in kerosene, and subjected to other forms of physical abuse. We see no indication in the BIA's decision that it considered this evidence.

The BIA failed to give reasoned consideration to Jathursan's CAT claim. It must be remanded to the BIA as well.

## IV.

For the foregoing reasons, we **GRANT** Jathursan's petition in part, **DENY** it in part, **VACATE** the BIA's order in part, and **REMAND** for further proceedings.