[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10487

_____

PRASATH NAVARATHNASINGAM,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A213-541-178

_____

Before LUCK, BRASHER, and HULL, Circuit Judges.

PER CURIAM:

Prasath Navarathnasingam petitions for review of the Board of Immigration Appeals's dismissal of his appeal of the immigration judge's order denying his application for asylum, withholding of removal, and relief under the Convention Against Torture. He argues that the immigration judge's adverse credibility finding was not supported by substantial evidence. He also argues that the immigration judge erred in concluding that he didn't corroborate his claims, show a pattern or practice of persecution, and establish eligibility for relief under the Convention Against Torture. After careful review of the record and the parties' briefs, and with the benefit of oral argument, we deny Navarathnasingam's petition.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### Navarathnasingam's Application

Navarathnasingam is an ethnic Tamil and a native and citizen of Sri Lanka. He entered the United States in 2020 without valid immigration documents, and the Department of Homeland Security served him with a notice to appear before an immigration judge, charging him with being removable. Navarathnasingam conceded removability and the immigration judge sustained the charge. He then filed an application for asylum, withholding of removal, and relief under the Convention Against Torture.

Navarathnasingam alleged in his application that he feared he would be persecuted, tortured, and murdered by the Sri Lankan

government because of his Tamil ethnicity if removed to Sri Lanka.[1] He wrote that he had been detained and tortured by the Sri Lankan miliary for long periods of time because they mistakenly thought he was a member of a Tamil separatist group known as the "Liberation Tigers of Tamil Eelam," or "Tamil Tigers."

Specifically, Navarathnasingam alleged that the Sri Lankan military detained him from 2009 to 2015 and tortured him with burns, ice and heat, repeated beatings, food deprivation, sexual harassment, and electric shock. The military released him in 2015 on the condition that he would not travel, seek medical treatment, or tell anyone about what happened during the detention. Navarathnasingam alleged that the military constantly monitored him and sporadically detained him and tortured him after his initial release. Unable to seek medical treatment, he treated his pain with ayurvedic medicine, oil, turmeric powder, and hot water when he returned home.

---

[1] "The asylum statute provides a list of five protected grounds: 'race, religion, nationality, membership in a particular social group, [and] political opinion.'" *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1287 n.11 (11th Cir. 2020) (quoting 8 U.S.C. § 1101(a)(42)(A)). In his asylum application, Navarathnasingam indicated that he sought asylum based on his "[r]ace." "We need not decide whether his Tamil ethnicity is, in fact, a statutorily protected ground, however, because the government has not raised this issue and because we affirm the [board] for other reasons." *See id.*; *see also Jathursan v. U.S. Att'y Gen.*, 17 F.4th 1365, 1370 n.1 (11th Cir. 2021) ("Whether Tamil is a race or an ethnicity makes no difference to our decision . . . .").

Navarathnasingam wrote that military officials went to his home and questioned his mother about where he was at least twice, threatening his mother that they would take her other son if Navarathnasingam wasn't there when they visited the next day. When officials arrived the next day, he alleged that they detained him and tortured him again. They yelled at him, beat him, sexually harassed him, urinated on him, and left him naked in a room for days. He was detained in December 2016 and released in April 2017.

Navarathnasingam alleged that his final detention began in late October 2018, after the military suspected his involvement in a protest for disappeared persons that occurred earlier that month. He alleged that his aunt, whose son had disappeared, asked him to drop her off at the protest, which took place outside a temple, and that he did not participate in the protest but instead entered the temple to pray. Later that month, military officials came to his home and detained him and tortured him again. They asked him questions about the protest and didn't believe that he wasn't involved. They sexually harassed him and burned his leg with an iron box.

Navarathnasingam alleged that he escaped from detention three months later, in January 2019, and hid at his uncle's house. Meanwhile, military officials went to his home and threatened his mother that they would shoot him if they found him. Navarathnasingam feared for his life, so he sought to leave the country. His mother sold their land, house, and jewels to get money to help

him leave and, in March 2019, Navarathnasingam escaped Sri Lanka, traveling on a flight out of a Sri Lankan airport and through many countries before eventually arriving in the United States.

Navarathnasingam attached to his application several news articles that discussed Sri Lanka's treatment of Tamil individuals, including a 2017 article identifying approximately 249 Tamil victims who were accused of being Tamil Tigers and tortured through beatings, burning by iron rods, and sexual violence.  He provided a 2009 notice from the Human Rights Commission of Sri Lanka that recognized the registration of a "complaint" by his mother with the commission (although the notice didn't describe the substance of her complaint or have Navarathnasingam's name).  He also provided a 2009 certificate of absence showing that his cousin was missing.

Navarathnasingam also introduced letters from family members, community organizations, and a Sri Lankan Justice of the Peace on his behalf.  The letters from his mother stated that Navarathnasingam was engaged in "social activities" and detained by the Sri Lankan military from 2009 through 2015; he was harassed three times after his release; his family in Sri Lanka is regularly harassed and threatened about his whereabouts; his life was not safe in Sri Lanka; and her eldest son was killed by the Sri Lankan miliary.  A letter from Navarathnasingam's aunt stated that he participated in the October 2018 protest, was arrested, detained, and severely assaulted because of the protest, and escaped military

custody and fled abroad in 2019. Navarathnasingam's other aunt wrote that he was engaged in social work and, due to his activities, was arrested, detained, and severely assaulted by the military until he escaped and moved in with her in 2016, and that the military continued searching for him and warned his mother to "hand over her son."

A letter from a community center stated that Navarathnasingam participated and played a leading role in social justice causes at the center, including "struggles" for disappeared people, and that he was taken away "very often" by the military "for inquiries" because of his work. Another letter from a social service organization stated that Navarathnasingam was a member who performed social welfare services, including peaceful protests. The organization wrote that its members "were threatened several times under the pretext of inquiries" by the Sri Lankan military. And the organization stated that Navarathnasingam participated in the October 2018 protest; that it lost contact with him after the protest and learned from his mother that he had been arrested by the military; and that a military official later contacted the organization inquiring about Navarathnasingam.

The letter from a Sri Lankan Justice of the Peace explained that Navarathnasingam's family "is the most affected persons due to the ethnic war in Sri Lanka." The oldest son was "shot and killed" by the Sri Lankan military, and Navarathnasingam "was engaged in [s]ocial work" and served a "key role" in organizing the October 2018 protest. The Justice of the Peace wrote that

Navarathnasingam was arrested, detained, and severely assaulted by the Sri Lankan miliary because of the protest before escaping to the United States, and his family members in Sri Lanka were "being harassed" and threatened by the Sri Lankan miliary about his whereabouts. The Justice of the Peace wrote that it was "not advisable" for Navarathnasingam to return to Sri Lanka because he wasn't safe there.

## Immigration Court Proceedings

The immigration judge held a hearing on Navarathnasingam's application. Navarathnasingam testified that the information in his application was correct. He also testified that the social service organization's letter didn't mention his six-year detention by the Sri Lankan military because "he did not mention that to them." His application never mentioned his participation in social activism or peaceful demonstrations, Navarathnasingam explained, because he "just wrote what . . . problems [he] faced." He denied participating in the October 2018 protest and insisted that the letters from the social service organization and the Sri Lankan Justice of the Peace had been incorrectly translated to English and that the Tamil versions didn't say that he participated in the October 2018 protest. He testified that he never went to a doctor or hospital because the military released him "under warning" that he could not seek medical treatment or tell anyone about what happened to him. Navarathnasingam said there were three encounters between his mother and the Sri Lankan military, two in December 2016, in which the military threatened to take his

brother, and a third in 2019, during which the military said it would shoot and kill Navarathnasingam.  He explained that his mother's letters failed to mention any of these encounters because he had already mentioned them in his statement, and "she just wrote up the . . . main problems."  And while he couldn't explain how he was able to get a passport in one day as "someone who had escaped from military custody," he maintained that he "did the fingerprints and everything" at the passport office and was able to board a flight without being questioned.

Navarathnasingam said that while detained by the military, he was shocked with electricity, repeatedly beaten, burned, and subjected to sexual violence.  The only medical treatment he sought for his injuries was ayurvedic treatment using herbs and oils because he was warned not to go to the hospital.  He had no documentation for his treatment in Sri Lanka and had not sought any other treatment after he left Sri Lanka.

The immigration judge denied Navarathnasingam's application for asylum, withholding of removal, and relief under the Convention Against Torture.  Before discussing Navarathnasingam's claims, the immigration judge made an adverse credibility finding, explaining that Navarathnasingam was "not a credible witness" because his statements were "inconsistent with the evidence in the record in regard to the basic facts underpinning material aspects of his claim."

The immigration judge based his adverse credibility finding on four inconsistencies and three implausibilities.  As to the

inconsistencies, the immigration judge first found that the social service organization failed to mention Navarathnasingam's six-year detention and, although Navarathnasingam's mother and aunt corroborated the detention, their testimony carried "minimal weight" because they were "interested witnesses who did not testify" at the hearing.

Second, the immigration judge found that Navarathnasingam didn't discuss social activism in his asylum application and marked the "no" box to the question about whether he "ever belonged or ha[s] been associated with any organization or groups in his home country." But his mother, aunt, and the social service organization all confirmed that Navarathnasingam was engaged in social activism.

Third, the immigration judge found that Navarathnasingam denied any involvement in the October 2018 protest, but his asylum application included two written statements from his aunt and the social service organization confirming that he participated in the protest. And Navarathnasingam's application explained that he had only dropped off his aunt at the October 2018 protest, but his aunt didn't mention him taking her to the protest in her letter.

And fourth, the immigration judge found that Navarathnasingam identified three encounters between the Sri Lankan military and his mother, but his mother didn't mention any encounters, and his aunt's letter said that one of these encounters occurred over the phone. The immigration judge found that

Navarathnasingam "did not provide a satisfactory explanation for these inconsistencies."

As to the implausibilities, the immigration judge found it implausible that Navarathnasingam had been tortured with electrical shocks, beatings, burns, and sexual violence but "only required as medical treatment 'ayurvedic medicine,' 'oil,' 'turmeric powder,' 'hot water,' and other unspecified medication." The immigration judge acknowledged Navarathnasingam's explanation that the Sri Lankan military ordered him not to seek medical care, but emphasized that he hadn't provided "any medical documentation from the United States (such as records prepared by the medical staff of the Stewart Detention Center) substantiating his claims of harm." The immigration judge also determined that Navarathnasingam's evidence from family and acquaintances failed to "identify his injuries or any lasting harm or physical or mental disabilities that he suffered from his alleged mistreatment."

Second, the immigration judge found it implausible that the Sri Lankan military granted Navarathnasingam "a great degree of autonomy," despite warning him not to go anywhere or tell anyone what happened to him. "For approximately four years, [he] was able to move around the northern region of Sri Lanka" and "even returned home from an ultimately unsuccessful arranged marriage," the immigration judge reasoned. Although Navarathnasingam's movement was "partially explained by his claim that he tried to avoid detection," and although he claimed that the military monitored him and visited his home, his freedom of

movement was "inconsistent with that of a government that allegedly was so interested in [him], that it detained [him] for six years between 2009 and 2015, and for six months between February and August of 2016."

Third, the immigration judge found Navarathnasingam's departure from Sri Lanka implausible. "Despite allegedly detaining him for six years, telling him that he 'can't go anywhere,' or 'tell anything about what happened,' and keeping track of him for about four years after his initial release from detention, the Sri Lankan government issued him a passport in one day." The immigration judge found it was implausible "that the Sri Lankan government would give him the means to depart the country and potentially seek asylum abroad, when it apparently fear[ed] him informing others of its alleged mistreatment of him."

Based on the inconsistencies and implausibilities as to "the extent of his alleged harms, his interaction with the Sri Lankan authorities, the authorities' level of interest in him, and his manner of departure from Sri Lanka," the immigration judge found that Navarathnasingam "was not a credible witness" and "his corroborative evidence" carried "minimal to no weight." Navarathnasingam's corroborative evidence only "accentuate[d] the severe problems in his testimony," the immigration judge determined, because: (1) the social service organization's and the Sri Lankan Justice of the Peace's letters stated that he participated in the October 2018 protest; (2) the social service organization's letter didn't mention Navarathnasingam's six-year detention; (3) his mother's letters

didn't mention any encounters with the Sri Lankan military; and (4) his aunt's letter didn't mention that he only took her to the October 2018 protest.

Because Navarathnasingam's testimony was neither credible nor sufficiently corroborated, the immigration judge found that he "failed to provide credible testimony or other reliable evidence," so he "failed to show past persecution or a well-founded fear of being singled out for persecution upon his return to Sri Lanka."

The immigration judge also found that Navarathnasingam failed to establish a pattern or practice of persecution in Sri Lanka against Tamil individuals. The immigration judge explained that a 2019 human rights report noted only that "Tamil individuals face discrimination and harassment in Sri Lanka," but was "silent as to whether they are persecuted or tortured" because of their ethnicity. While the report stated that journalists and protestors faced harassment and sometimes violence, Navarathnasingam was "neither a journalist nor a protestor." "Given the conflicting evidence about whether [Navarathnasingam] engaged in community activism on behalf of Tamil individuals," the immigration judge was "left to believe that [he] [wa]s, instead, a private citizen with no involvement in Sri Lankan politics or the issues that the Tamil community faces."

The immigration judge took administrative notice that there were approximately 2,563,591 Tamil individuals in Sri Lanka, and they represented about 11.2 percent of the Sri Lankan population. The immigration judge explained that Navarathnasingam's

2017 article "identified about 249 Tamil victims of what would qualify as persecution or torture" and that those victims could not "be said to be representative of what happens to the average Tamil individual or suspected Tamil Tiger supporter." The immigration judge reasoned that experiences of persecution or torture against Tamil individuals "appear to be statistical aberrations." The immigration judge recognized that "the Sri Lankan Tamil population face[d] discrimination, harassment, and adversity in Sri Lanka," but the immigration judge found that Navarathnasingam did not show that there was "systemic widespread or organized pattern or practice of persecution against those individuals in Sri Lanka today."

Given Navarathnasingam's "failure to satisfy the lower burden of proof for asylum," the immigration judge concluded that Navarathnasingam's withholding of removal claim also failed. And, because Navarathnasingam failed to establish the facts of his case with credible testimony or reliable evidence in the record, and because "general country conditions evidence of human rights abuses and discrimination against Tamil individuals in Sri Lanka" was insufficient for him to meet his burden, the immigration judge concluded that Navarathnasingam also failed to establish eligibility for protection under the Convention Against Torture.

*The Board of Immigration Appeals's Decision*

The board dismissed Navarathnasingam's appeal. The board found "no clear error" in the immigration judge's adverse credibility finding, explaining that the immigration judge "capably describe[d] the discrepancies and implausible assertions upon

which [his] finding was based." The board also explained that, while Navarathnasingam sought to "offer alternative explanations for some of those discrepancies on appeal," he failed to demonstrate that the immigration judge's credibility assessment was based on an impermissible or implausible view of the evidence.

The board explained that, given the immigration judge's reasonable concerns about his credibility, Navarathnasingam "needed to come forward with strong corroborative evidence." Yet Navarathnasingam's corroboration was "either general and lacking in detail (so as to be of limited help) or contain[ed] details that [we]re at odds with his own version of events," like the discrepancy about his participation in the October 2018 protest. And, despite Navarathnasingam's allegations about "extremely severe physical torture over a sustained period in Sri Lanka," he provided "no medical evidence—such as proof of scarring, burning, or other indications of healed soft-tissue damage—to substantiate these claims."

Because the immigration judge's "adverse credibility and corroboration findings were based on a permissible view of the record," the board concluded that Navarathnasingam's asylum and withholding of removal claims were "properly denied." The board also concluded that the immigration judge "properly determined" that Navarathnasingam "did not demonstrate that Tamils in Sri Lanka [were] subjected to 'extreme and pervasive' persecution, as required for a pattern or practice to exist." And because Navarathnasingam's Convention Against Torture claim was based on

the "same facts and evidence" as his asylum claim, the board concluded that the "adverse credibility finding in the asylum context" was "dispositive" of his Convention Against Torture claim.

## STANDARD OF REVIEW

We review the board's decision as the agency's final decision unless, as in this case, the board expressly adopted or agreed with the immigration judge's decision. *Jathursan*, 17 F.4th at 1372. Where the board agreed with the immigration judge's reasoning, we review the decisions of both the board and the immigration judge to the extent of the agreement. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016).

We review de novo all legal conclusions, and we review factual determinations—including credibility findings—under the substantial evidence test. *Jathursan*, 17 F.4th at 1372; *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1230–31 (11th Cir. 2006) (the immigration judge's "factual determinations, including credibility determinations, are reviewed under a substantial evidence standard"). Under the substantial evidence test, we will not disturb the board's findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Jathursan*, 17 F.4th at 1372 (quotation omitted). We view the record evidence in the light most favorable to the board's decision and draw all reasonable inferences in its favor. *Thamotar v. U.S. Att'y Gen.*, 1 F.4th 958, 969 (11th Cir. 2021). We will reverse a fact finding only when "the record compels reversal." *Jathursan*, 17 F.4th at 1372 (quotation omitted). "[T]he mere fact that the record may support a

contrary conclusion is insufficient to justify reversal." *Id.* (quotation omitted).

## DISCUSSION

Navarathnasingam raises four arguments in his petition. First, he contends that the board's adverse credibility finding was not supported by substantial evidence. Second, he asserts that the board erred in finding that he didn't corroborate his claims. Third, he maintains that the board erred in finding that he failed to show a pattern or practice of persecution. And fourth, he argues that the immigration judge erred in finding that he failed to establish eligibility under the Convention Against Torture.

### Adverse Credibility Finding

To be eligible for asylum, a noncitizen must establish a "well-founded fear" that his "race, religion, nationality, membership in a particular social group, or political opinion . . . . will cause harm or suffering that rises to the level of persecution." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation omitted). "In order to demonstrate a sufficient connection between future persecution and the protected activity," an asylum applicant "is required to present specific, detailed facts showing a good reason to fear that he . . . will be *singled out* for persecution on account of such protected activity." *Id.* (quotation omitted). An applicant's history of past persecution creates a presumption that he has a "well-founded fear" of future persecution, "although that presumption can be rebutted by the government." *Id.* An

applicant "does not have to prove he would be singled out if he can establish a pattern or practice of persecution of a group of which he is a member." *Lingeswaran*, 969 F.3d at 1290–91 (quotation omitted).

"The asylum applicant must establish eligibility for asylum by offering credible, direct, and specific evidence in the record." *Forgue*, 401 F.3d at 1287 (quotation omitted). "The testimony of an applicant, if found to be credible, is alone sufficient to establish these factors." *Id.*; *see* 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."); 8 C.F.R. § 208.16(b) (same).

"Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." *Forgue*, 401 F.3d at 1287. An adverse credibility finding does not, however, alleviate the immigration judge's duty to consider other evidence produced by an asylum applicant. *Id.* The immigration judge "must still consider *all* evidence introduced by the applicant." *Id.* If the applicant provided "other evidence of persecution, whatever form it may take," the immigration judge "must consider that evidence" and cannot "rely solely on an adverse credibility determination in those instances." *Id.*

"Considering the totality of the circumstances, and all relevant factors," the immigration judge may base a credibility finding on the plausibility of the applicant's account and the consistency of the applicant's statements with other record evidence, "without regard to whether an inconsistency . . . goes to the heart of the

applicant's claim." *Chen*, 463 F.3d at 1231 (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)).

To make an adverse credibility finding, the immigration judge "must offer specific, cogent reasons" why the applicant was not credible. *Forgue*, 401 F.3d at 1287. Once the immigration judge makes an adverse credibility finding, the burden is on the applicant to show that the credibility finding was not supported by "specific, cogent reasons" or was not based on substantial evidence. *Id.* A "credibility determination, like any fact finding, may not be overturned unless the record compels it." *Id.* (quotation omitted).

Here, the immigration judge offered seven "specific, cogent reasons" for the adverse credibility finding. *See id.* The immigration judge explained that: (1) the social service organization didn't mention Navarathnasingam's six-year detention; (2) Navarathnasingam didn't discuss his social activism in his application and denied participation in any organization in Sri Lanka; (3) Navarathnasingam denied involvement in the October 2018 protest; (4) Navarathnasingam's mother didn't mention any encounters with the Sri Lankan military despite his claim that the military told his mother that it would take her other son and "shoot" Navarathnasingam; (5) Navarathnasingam claimed to have been tortured but "only required as medical treatment 'ayurvedic medicine,' 'oil,' 'turmeric powder,' 'hot water,' and other unspecified medication"; (6) the Sri Lankan military granted Navarathnasingam "a great degree of autonomy"; and (7) "the Sri Lankan government issued him a passport in one day."

These inconsistencies and implausibilities are supported by substantial evidence in the record.   Most significantly, Navarathnasingam denied participation in the October 2018 protest, while a Justice of the Peace in Sri Lanka said that Navarathnasingam played a "key role in organi[z]ing the protest," and Navarathnasingam's aunt and the social service organization also confirmed his participation.   Navarathnasingam also denied belonging to any organization in Sri Lanka in his application, but he provided letters from two organizations—the community center and the social service organization—both confirming his active participation.   The record shows that Navarathnasingam treated his bodily pain only with ayurvedic medicine, oil, turmeric powder, hot water, and back pain medication, even after escaping Sri Lanka, despite claiming that the Sri Lankan military burned his leg with an iron box and tortured him with ice and heat, repeated beatings, food deprivation, sexual harassment, and electric shock.   And Navarathnasingam confirmed that he obtained a passport in one day and succeeded leaving the country by plane with no issues, despite being constantly monitored by the military and a fugitive from military custody.

Navarathnasingam argues that the immigration judge's adverse credibility finding wasn't supported by substantial evidence for three reasons.   He first insists that his hearing testimony "answer[ed]" the inconsistencies and implausibilities and that his explanations "make sense" and are "compelling," "quite possible," and "quite plausible."     But, even if Navarathnasingam's

"explanations of the implausible aspects of his claim[s] are tenable, we cannot say, especially given the relative lack of corroborating evidence, that these explanations would compel" a reasonable fact-finder to reverse the immigration judge's adverse credibility finding. *See Chen*, 463 F.3d at 1233.

Second, Navarathnasingam contends that the immigration judge "completely failed to take . . . into account" parts of his evidence and testimony. In particular, he asserts that the immigration judge ignored his testimony that the social service organization's and the Sri Lankan Justice of the Peace's letters were incorrectly translated and the 2009 notice from the Human Rights Commission that "confirm[ed] that he was detained for [six] years." But the immigration judge considered Navarathnasingam's testimony at the hearing and found that he was the one who "provided th[e] translation" of the letters.[2] And the 2009 notice from the Human Rights Commission did not "confirm[]" Navarathnasingam's detention—the notice did not have his name and stated only that his mother's "complaint dated 12.08.2009 has been registered under

---

[2] Navarathnasingam points out that he attached to his board appeal brief a new translation of his aunt's letter, which states that he did not take part in the October 2018 protest. But he did not move the board to remand to the immigration judge so he could supplement the record and ask the immigration judge to reconsider his fact findings. *See* 8 C.F.R. § 1003.1(d)(3)(iv). Like the board, we may not make fact findings or consider new evidence outside the administrative record before the immigration judge. *See* 8 U.S.C. § 1252(b)(4)(A); *Huang v. U.S. Att'y Gen.*, 429 F.3d 1002, 1007 & n.1 (11th Cir. 2005).

the above number and is receiving the attention of the Commission," without identifying the substance of her complaint.

Even if these parts of Navarathnasingam's testimony and evidence corroborated his claim, the immigration judge did not fail to take them into account. The immigration judge considered "the totality of the circumstances" and "all documentary and testimonial evidence" in assessing whether Navarathnasingam was credible. *See Forgue*, 401 F.3d at 1287. Despite Navarathnasingam's insistence that the immigration judge "completely failed" to consider parts of the record, the immigration judge was "not required to discuss every piece of evidence presented before him," and nothing indicates that the immigration judge ignored Navarathnasingam's evidence. *See Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1376 (11th Cir. 2006). Only after reviewing Navarathnasingam's evidence did the immigration judge find that the inconsistencies and implausibilities about Navarathnasingam's "alleged harms, his interaction with the Sri Lankan authorities, the authorities' level of interest in him, and his manner of departure from Sri Lanka" made him "not a credible witness."

Third, Navarathnasingam asserts that the inconsistencies and implausibilities were "non-material omissions and inconsistencies" with "no tendency to suggest" he "fabricated" his claim. To be sure, an immigration judge's adverse credibility determination can't be based on "wholly immaterial" inconsistencies. *See Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1305 (11th Cir. 2009) (explaining that the petitioner's use of the word "car" in his testimony and

"truck" in his written statement was a "wholly immaterial" "difference in terminology" and "not inconsistent[] at all"). But we cannot call the omissions and inconsistencies that the immigration judge identified "wholly immaterial." Each related to a material aspect of Navarathnasingam's claims—his six-year detention, his social activism and participation in the October 2018 protest, the torture he experienced, the military's monitoring of him and threats against his family, and his escape from Sri Lanka. These significant parts of Navarathnasingam's account are a far cry from "wholly immaterial" "difference[s] in terminology" like the difference between "car" and "truck" that we found insufficient to support an adverse credibility finding in *Kueviakoe*.

And even if the omissions and inconsistencies did not "go[] to the heart of [Navarathnasingam's] claim," the immigration judge could still rely on them in making an adverse credibility determination. *See Chen*, 463 F.3d at 1233 ("[T]he trier of fact may base a credibility determination on any inaccuracies or falsehoods in the applicant's statements, *without regard to whether an inconsistency . . . goes to the heart of the applicant's claim, or any relevant factor*." (alterations adopted) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). So, "to the extent" Navarathnasingam "argues the inconsistencies and discrepancies are 'trivial' and 'irrelevant to the dispositive issues,' he ignores . . . [section] 1158(b)(1)(B)(iii)." *See id.*

The immigration judge—"who actually observed" Navarathnasingam—was "best positioned" to assess his credibility in the

first instance. *See Garland v. Ming Dai*, 141 S. Ct. 1669, 1678 (2021). We cannot overturn the immigration judge's adverse credibility finding "unless the record compels it," and it does not. *See Forgue*, 401 F.3d at 1287. Because Navarathnasingam hasn't met his burden to show that the immigration judge's adverse credibility determination wasn't supported by specific, cogent reasons or wasn't based on substantial evidence, we may not overturn it. *See id.*

### Corroboration

"An applicant's failure to corroborate his testimony can be fatal to his asylum application." *Morales v. U.S. Att'y Gen.*, 33 F.4th 1303, 1308 (11th Cir. 2022). While "[a]n applicant's testimony, if credible, may be found alone sufficient to meet his burden for asylum," "[t]he weaker an applicant's testimony . . . the greater the need for corroborative evidence." *Id.* (quoting *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005)). The immigration judge found that Navarathnasingam's corroborative evidence "accentuate[d] the severe problems in his testimony," and the board agreed, finding that Navarathnasingam's corroborative evidence was either "at odds with his own version of events" or "general and lacking in detail."

The record doesn't compel reversal of the immigration judge and the board's corroboration finding. Navarathnasingam relied on the letters from family and acquaintances to corroborate his account of persecution, but parts of those letters conflicted with his own statements and otherwise stated only generally that he was arrested, detained, and severely assaulted by the Sri Lankan military, without providing details. The letters never mentioned

Navarathnasingam's injuries and, while Navarathnasingam described extensive torture over a long duration in his own statements, he failed to provide medical records, photographs, or any other evidence to corroborate his account. The several news articles Navarathnasingam provided didn't mention his name or personal experiences, the 2009 notice from the Human Rights Commission also didn't mention his name or provide details, and the certificate about his missing cousin didn't provide specifics as to Navarathnasingam. Navarathnasingam's evidence wasn't strong enough to corroborate his incredible testimony. *See Yang*, 418 F.3d at 1201.

Navarathnasingam argues that he didn't provide "medical evidence" of his torture because "nobody asked" for it; that the "discrepancy" about his participation in the October 2018 protest was "a translation error"; that the judge "failed to take into account" the 2009 notice from the Human Rights Commission and the certificate about his missing brother; and that the immigration judge "did not identify what other documents [he] could have provided and why it was not provided." But it was Navarathnasingam's burden to offer "credible, direct, and specific evidence" to support his application, *see Forgue*, 401 F.3d at 1287, and the immigration judge and the board properly considered the absence of medical evidence corroborating his torture, the conflicting statements about his participation in the October 2018 protest, and the absence of details about Navarathnasingam in the 2009 notice

21-10487          Opinion of the Court          25

from the Human Rights Commission and the certificate about his missing cousin.[3]

### Pattern or Practice of Persecution

An applicant can satisfy his burden to establish a "well-founded fear" of future persecution by showing that there exists "a pattern or practice of persecution" of a group of which he is a member. *Lingeswaran*, 969 F.3d at 1290. "To prove the existence of a pattern or practice of persecution, the alien must prove that the mistreatment of persons similarly situated is extreme and pervasive." *Murugan v. U.S. Att'y Gen.*, 10 F.4th 1185, 1193 (11th Cir. 2021).

The immigration judge found that, while the record showed that Tamil individuals suffered harassment and discrimination in

---

[3] We reject Navarathansingam's claim that the immigration judge was required to identify needed corroborative evidence in advance of the merits hearing, as have the majority of Circuits and the BIA. *See Wambura v. Barr*, 980 F.3d 365, 373-74 (4th Cir. 2020); *Avelar-Oliva v. Barr*, 954 F.3d 757, 770-71 (5th Cir. 2020); *Uzodinma v. Barr*, 951 F.3d 960, 966-67 (8th Cir. 2020); *Wei v. Sessions*, 883 F.3d 23, 28-30 (2d Cir. 2018); *Gaye v. Lynch*, 788 F.3d 519, 529-30 (6th Cir. 2015); *Rapheal v. Mukasey*, 533 F.3d 521, 530 (7th Cir. 2008); *Matter of L-A-C-*, 26 I. & N. Dec. 516, 520 (BIA 2015). We note also that at the hearing the IJ asked Navarathnasingam questions that gave him the opportunity to explain missing corroborative evidence. *See Matter of S-M-J-*, 21 I. & N. Dec. 722, 725-26 (BIA 1997) (en banc) (providing that "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided," and if it is not, "an explanation should be given as to why such information was not presented").

Sri Lanka, Navarathnasingam failed to show "systemic widespread or organized pattern or practice of persecution against those individuals in Sri Lanka today." The board agreed that Navarathnasingam "did not demonstrate that Tamils in Sri Lanka are subjected to 'extreme and pervasive' persecution, as required for a pattern or practice to exist."

The record doesn't compel reversal of the immigration judge and the board's pattern or practice finding. The 2019 human rights report stated that the Sri Lankan government instituted a "variety of ministries and presidentially appointed bodies deigned to address the social and development needs of the Tamil minority." The Sri Lankan Office of National Unity and Reconciliation, "established in 2016, continued to coordinate the government's reconciliation efforts" with the Tamil community, focusing on the promotion of "social integration to build an inclusive society," "language rights for all citizens," "a healing process within war-affected communities," and "nonrecurrence of the violence." And the Tamil National Alliance and Defense Ministry "continued to meet in accordance with a formal dialogue on returning military-held lands in the Northern and Eastern Provinces inaugurated in 2017." Like the record in *Lingeswaran*, the record here shows that "the Sri Lankan government has made recognized efforts to improve the situation for Tamils and reconcile the country." *See* 969 F.3d at 1291.

Navarathnasingam asserts that the immigration judge and the board's pattern or practice finding was erroneous because: (1) the board "reli[ed] on the factual findings" of other cases rather

than "exclusively on the record" of his case; and (2) it was based on the adverse credibility finding. But the board did not rely on "factual findings" from other cases—it relied on the immigration judge's "proper determ[ination]" that Navarathnasingam's evidence didn't "demonstrate that Tamils in Sri Lanka are subjected to 'extreme and pervasive' persecution" and cited other cases as consistent examples. And for the reasons we explained, substantial evidence supported the immigration judge and the board's adverse credibility finding. *See Forgue*, 401 F.3d at 1287.

### *Denial of Relief Under the Convention Against Torture*

To qualify for relief under the Convention Against Torture, "an alien must establish standards more stringent tha[n] those for asylum eligibility." *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 891 (11th Cir. 2007). "Thus, an alien unable to prove a 'well-founded fear' of persecution based on a protected ground, as required for asylum relief, necessarily fails to demonstrate" eligibility for relief under the Convention Against Torture. *Id.* Because Navarathnasingam failed to prove eligibility for asylum, he "necessarily" cannot prove entitlement to relief under the Convention Against Torture. *See id.*

★    ★    ★    ★

Because substantial evidence supported the immigration judge and the board's credibility, corroboration, and pattern or practice findings, we conclude that substantial evidence supports the denial of Navarathnasingam's asylum claim. *See Forgue*, 401 F.3d at 1287–88. And because Navarathnasingam "failed to

establish a claim of asylum on the merits," he "necessarily" failed to establish eligibility for relief under the Convention Against Torture. *See id.* at 1288 n.4.

**PETITION DENIED.**