[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12402

_____

MEHEDI HASAN-NAYEM,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A213-538-941

_____

Before LAGOA, BRASHER, and ED CARNES, Circuit Judges.

LAGOA, Circuit Judge:

Mehedi Hasan-Nayem, a native and citizen of Bangladesh, seeks review of the Board of Immigration Appeals' ("BIA") final order affirming the immigration judge's denial of his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). In the removal proceedings, the immigration judge made an adverse credibility determination against Hasan-Nayem based on (1) inconsistencies and omissions between his hearing testimony and the documentary evidence in the record and (2) his demeanor at the hearing. The BIA affirmed the immigration judge's adverse credibility determination, finding that it was not clearly erroneous and adopting much of the immigration judge's reasoning.

In his petition, Hasan-Nayem argues that the BIA's affirmance of the adverse credibility determination was error. He contends that the findings in support of that determination are not supported by substantial evidence in the record and that the immigration judge failed to cite examples in her analysis of his demeanor.

After careful review and with the benefit of oral argument, we conclude that substantial evidence supports the adverse credibility determination against Hasan-Nayem. Accordingly, we deny his petition for review.

I.      FACTUAL AND PROCEDURAL BACKGROUND

Hasan-Nayem, a native and citizen of Bangladesh, entered the United States near McAllen, Texas, in December 2019. After an asylum officer determined that Hasan-Nayem had a credible fear of political persecution, the Department of Homeland Security filed a notice to appear, charging him with removal under 8 U.S.C. § 1182(a)(6)(A)(i) and (a)(7)(A)(i)(I). Hasan-Nayem, who at the time was proceeding *pro se*, conceded the charges of removability during a master calendar hearing on April 21, 2020. After obtaining counsel, Hasan-Nayem filed an application for asylum, withholding of removal, and CAT relief.

Because this case concerns an adverse credibility determination against Hasan-Nayem based on inconsistencies and omissions between his hearing testimony and the documentary evidence as well as his demeanor at the hearing, we discuss the relevant evidence and testimony below.

## A. The Credible Fear Interview

After Hasan-Nayem entered the United States, an asylum officer conducted a credible fear interview with him. In that interview, Hasan-Nayem stated the following.

Hasan-Nayem was afraid to return to Bangladesh because of the actions of people in the Awami League (the "AL")—the ruling political party in Bangladesh—and the actions of the police. He was threatened once and physically harmed three times in Bangladesh.

On July 30, 2018, AL members threatened Hasan-Nayem in person because he worked for the Liberal Democratic Party (the "LDP"). About two weeks later, on August 15, 2018, ten to twelve AL members "came up" to Hasan-Nayem and "punch[ed]" him while he was putting up LDP posters. They also "beat" him "with their sticks," tore down his posters, and told him to stop working for the LDP. At least one of the attackers had been part of the group that previously threatened him.

On December 16, 2018, AL members came to a "meeting with sticks" and "beat" Hasan-Nayem. When asked how he was harmed, Hasan-Nayem stated that he was hit on his "arms and legs with sticks." His friends faced similar beatings by AL members.

The last time Hasan-Nayem was harmed, he was out buying medicine for his brother when AL members stopped him, started hitting him, and then injured him "with their sticks and knife." When asked how they injured him with a knife, he stated it was his "hand and legs," explaining that the members had aimed for his chest but he had moved, resulting in the hand and leg injuries—two stab wounds. Hasan-Nayem reported this incident to the police, but the police stated that the attackers worked for the ruling party so "they couldn't do anything" and that if he came back to the police again, they would make a false case and put him in jail.

Hasan-Nayem could not return to Bangladesh because the AL would kill him for his work for the LDP. The AL would learn if he returned to Bangladesh because they know his name, have a photograph of him, and know where he and his family live. He

could not live safely in another part of Bangladesh because "the second and third time [he] was beaten[,] [he] ran away"—to his grandfather's house, the second time, and to his sister's house, the third time—but AL members still found him because they asked around with his photo. He did not believe that the police or government in Bangladesh could protect him because they all worked for the AL and would look the other way if he was harmed.

## B. Asylum Application and Supporting Documents

Hasan-Nayem subsequently applied for asylum, withholding of removal, and CAT relief. In his asylum application, Hasan-Nayem stated that AL members threatened him and attacked him three times. In support of his application, Hasan-Nayem submitted his own declaration in which he stated the following.

AL members threatened him on July 30, 2018. On August 15, 2018, AL members attacked him, beating him "with bamboo sticks and hands." Eventually, people came to his rescue and took him to a nearby doctor for medical attention. On December 16, 2018, Hasan-Nayem was returning home with a colleague from an LDP meeting when AL members attacked him. After this attack, he went to his maternal grandparents' house and then went to the police station with his father to lodge a complaint against the AL members. But the officers did not help Hasan-Nayem because AL was the political party in power. The officers threatened him and his father, stating that if they ever returned, the officers would have him "arrested in false charges" and placed in jail. Additionally, while hiding at his grandparents' house, AL members continued to

threaten and look for Hasan-Nayem. On April 11, 2019, Hasan-Nayem came back to see his brother and was attacked by eight AL members while he was out getting medicine for his brother. The members abused him in "slang language" and "started hitting" him with "bamboo and hockey sticks" because of his affiliation with the LDP. A passerby and others eventually came to his aid and took him to the hospital, where he stayed for four days. Then, Hasan-Nayem went to his sister's house in Dhaka to "save" his life. While there, he kept receiving threatening phone calls from AL members, and his sister and brother-in-law arranged for him to come to the United States.

Hasan-Nayem also submitted affidavits from several family members and friends in support of his application, as well as medical records and other documents. The relevant portions of the supporting documentation are as follows.

In his affidavit, Hasan-Nayem's father attested to the following. On August 15, 2018, AL members assaulted and injured Hasan-Nayem. On December 16, 2018, AL members attacked his son, "beat[ing] him." After being taken to and discharged from the hospital, Hasan-Nayem went to the police station, where he was refused assistance. His father, however, did not attest that he accompanied Hasan-Nayem to the police station. On April 19, 2019, AL members attacked Hasan-Nayem, "badly beat[ing] him." After AL members came looking for Hasan-Nayem while he was at the hospital, his father sent Hasan-Nayem to his daughter's house in Dhaka.

Hasan-Nayem's mother also provided an affidavit containing similar testimony. She did not mention anyone other than Hasan-Nayem going to the police station. She stated that AL members came to their house while Hasan-Nayem was in the hospital following the April 2019 attack and that she informed them that her son was not in the village and had gone to Dhaka.

In her affidavit, Hasan-Nayem's sister attested as follows. AL members had attacked Hasan-Nayem three times, and he came to her house in Dhaka after the April 2019 attack. After Hasan-Nayem continued to receive threats over the phone, his sister and her husband made arrangements for Hasan-Nayem to leave Bangladesh. His sister, however, did not mention that AL members were searching for Hasan-Nayem in Dhaka with his photograph.

Hasan-Nayem also submitted the affidavit of Imran Srabon, his friend and an LDP member. Srabon witnessed the December 2018 attack against Hasan-Nayem. Following the attack, Srabon stated that he went to the police station with Hasan-Nayem to report the attack; Srabon did not state whether Hasan-Nayem's father accompanied them.

Hasan-Nayem also provided the following medical records: (1) August 2018 records, which stated that he sustained multiple bruises on his face and other parts on his body; (2) December 2018 records, which stated that he suffered from a severe concussion and had various injury marks and swelling on his hands, legs, and other parts of the body due to physical assault; and (3) April 2019 records, which stated that he had multiple wounds, exhibited signs of

trauma with blunt force (and objects), had a severed artery to his back causing internal hematoma and massive swelling, and had injuries to his face, hands, and legs. He also submitted various documents in support of his application: (1) a 2019 Human Rights Watch report on Bangladesh; (2) several news articles about harassment and killings of LDP members; and (3) the U.S. State Department's 2018 Human Rights Report for Bangladesh.

### C. Merits Hearing

On January 13, 2021, Hasan-Nayem appeared with the assistance of counsel at a hearing before an immigration judge. He testified as follows.

Hasan-Nayem came to the United States in December 2019 to "save [his] life" because he was "a victim of political terrorism." He was threatened by AL members one time face to face and many times over the phone and was attacked three times.

At this point in the hearing, the immigration judge noticed that Hasan-Nayem was looking down at his hands before he responded and ordered him to take off his jacket and put it behind his chair. The immigration judge told him to look at her when he was testifying so she could make sure that he was not looking at anything in front of him. She asked if he had anything written on his arms, hands, or the sleeves of the shirt he was wearing, and he said he did not. Hasan-Nayem then continued to testify as follows.

AL members first threatened Hasan-Nayem on July 30, 2018, because he was an LDP member. AL members then attacked

him on August 15, 2018, while he was putting up posters for the LDP. They kicked him and beat him up, and he received injuries on his arms, back, and legs.

On December 16, 2018, AL members attacked Hasan-Nayem as he was coming back from an LDP meeting. The AL members kicked him, punched him, and beat him with their hands and bamboo sticks; he sustained injuries to his back, arms, and legs. Srabon helped him escape from the attackers. Both his father and Srabon went to the police station with him. The police stated that they supported the AL, would not help Hasan-Nayem, and would put him in jail if he came back to "file a case." After the second attack, Hasan-Nayem went to his grandfather's house for about four months, during which he received threats via the telephone.

The third attack occurred on April 11, 2019, after Hasan-Nayem had returned to his own home because his brother was sick. As he was going to get medication for his brother, AL members approached him and started beating him up. Hasan-Nayem was rescued by a group of people, including one of his neighbors. They took Hasan-Nayem to the hospital, where he stayed for four days. He had "some cuts and bruises" and received stitches on his forehead and bandages. After this third attack, Hasan-Nayem went to his sister's house in Dhaka, where he stayed for two months. While in Dhaka, he received threatening phone calls, and AL members came to the area near his sister's house, showing people a photograph of Hasan-Nayem and asking if they had seen him. His

brother-in-law then arranged for Hasan-Nayem to go to the United States on June 24, 2019, to "save" his life.

On cross-examination, the government asked Hasan-Nayem how he was harmed during the August 2018 attack, to which Hasan-Nayem first stated that he did not understand and then repeated his previous account of the attack. He then stated that the AL members kicked him, punched him, and hit him with sticks. His mother was threatened by AL members after the April 2019 attack. During the April 2019 attack, Hasan-Nayem sustained a cut to his forehead and a cut on his leg, and he had pain in his arms. The men used bamboo sticks, hockey sticks, their hands, and a knife during the April 2019 attack. He explained that he did not mention the knife in his declaration because the attackers mainly used bamboo sticks and hockey sticks. When asked why the April 2019 medical records did not mention stitches or bandages, Hasan-Nayem responded that he did not understand and that the medical records showed he received stitches and bandages. Hasan-Nayem believed that the AL members discovered his phone number through his SIM card registration and phone payment and that they could find him in Dhaka because AL members tell each other when people move. Hasan-Nayem testified that none of his family members told the AL members that he had gone to Dhaka. When asked why his mother had stated in her affidavit that she told the AL members that he had gone to Dhaka, Hasan-Nayem responded that he did not understand and, when asked again, he said that he did not know. When asked why his family members did not

mention that he hid at his grandparents' house in their affidavits, Hasan-Nayem responded that he did not understand and, when asked again, he responded he did not know.

Upon questioning by the immigration judge, Hasan-Nayem further testified as follows. During the December 2018 incident, he sustained injuries to his arms, back, and legs, but did not recall why the medical record did not mention any injuries to his head. The immigration judge asked why he had not mentioned the concussion that was described in his medical records, and he said he did not remember. Hasan-Nayem also testified that he knew of other general LDP workers that were threatened and attacked by AL members.

On redirect examination, Hasan-Nayem testified to the following. While he was in the hospital after the April 2019 attack, AL members spoke to his mother at their home, but he did not know what she said to them. When Hasan-Nayem was staying with his sister, he was told that AL members were showing his picture but did not know where they were showing it.

### D. The Immigration Judge's and BIA's decisions

On January 19, 2021, the immigration judge issued an oral decision denying Hasan-Nayem's application for relief from removal. The immigration judge stated that she had considered all the evidence presented in the case and that, after considering all the circumstances and all the relevant factors, found that Hasan-Nayem did not testify credibly. The immigration judge noted that,

at "first blush," Hasan-Nayem and the eye witnesses were consistent with respect to the dates of his three attacks and the telephonic threats.  But, "upon closer examination," she found that (1) Hasan-Nayem's testimony "was at times inconsistent with the other evidence of record and internally inconsistent[,]" (2) there were "omissions and inconsistency between his testimony and the witnesses' affidavits and the proffered medical evidence[,]" and (3) "[s]ome of the corroborating evidence [did] not support [his] testimony or [was] inconsistent with other evidence."  Further, the immigration judge had "plausibility concerns regarding the crux of his claim that as a 20-year-old general worker for the LDP he was targeted with death by AL supporters."  And, "with respect to his demeanor," the immigration judge found that Hasan-Nayem "gave the impression at times that he was recalling words or phrases that had been memorized rather than describing events fully as they actually happened to him," e.g., he "repeated his prior response verbatim rather than respond to the question asked."  The judge found that this "came across as evasive and nonresponsive."

As to the inconsistencies and omissions, the immigration judge found "significant discrepancies" between Hasan-Nayem's prior statements and hearing testimony about the injuries that he sustained during the December 2018 and April 2019 attacks.  While Hasan-Nayem testified he was cut on the forehead (and required stitches) after the April 2019 attack, he testified during the credible fear interview that he was stabbed with a knife twice on his hand and legs.  But, in his declaration, he omitted the knife, describing

only being hit with bamboo and hockey sticks. Further, at the hearing, Hasan-Nayem never mentioned being stabbed or cut anywhere else than his forehead. And the hospital's "injury certificate" omitted any mention of stab wounds or Hasan-Nayem being treated for cuts or receiving sutures and bandages for those injuries. Rather, the certificate stated that he "suffered multiple wounds with signs of trauma with blunt force" and "had a severed artery to his back causing internal hematoma and massive swelling." But, the immigration judge explained, Hasan-Nayem did not mention such back injuries or swelling. As to the December 2018 attack, the immigration judge found that Hasan-Nayem's testimony was inconsistent with the letter from the medical services and eye treatment clinic. Hasan-Nayem did not mention the severe concussion noted in the clinic's letter; he simply mentioned injuries to his back, arms, and legs.

The immigration judge also found Hasan-Nayem's testimony about who accompanied him to the police station internally inconsistent as well as inconsistent with the corroborating evidence. Hasan-Nayem testified that he went to the police station with his father and Srabon, but Hasan-Nayem's declaration affirmed that he went only with his father. By contrast, Srabon's affidavit reflected he and Hasan-Nayem went to the police station alone, not accompanied by Hasan-Nayem's father. And the father's affidavit mentioned only that Hasan-Nayem went to the police station; it did not state that he accompanied his son nor did it mention Srabon.

Additionally, the immigration judge noted that, while Hasan-Nayem claimed he was residing at his grandfather's house, none of the affidavits from his family members corroborated that he was in hiding at that house. The immigration judge also noted that, while Hasan-Nayem claimed that AL members showed his photograph near his sister's house, his sister's affidavit did not mention that fact. And the immigration judge also noted that Hasan-Nayem's testimony was inconsistent with his mother's affidavit—while his mother attested that she told the AL members that her son went to Dhaka, Hasan-Nayem testified that no one had told the AL of his whereabouts.

Considering the totality of the circumstances, the immigration judge found that Hasan-Nayem was not credible given the discrepancies between his testimony and the corroborating evidence that he submitted.[1] The immigration judge therefore denied Hasan-Nayem's application for asylum and withholding of removal because he could not meet his burden of proof given the adverse credibility finding, and also denied his CAT claim.

---

[1] The immigration judge also had additional concerns with other supporting documents that caused her to question the plausibility of Hasan-Nayem's claim—whether Hasan-Nayem, as an LDP general worker, was specifically targeted for harm by the AL. The BIA did not rely on this reasoning in affirming the immigration judge's decision, and we therefore do not consider it when reviewing Hasan-Nayem's petition. *See Jathursan v. U.S. Att'y Gen.*, 17 F.4th 1365, 1372 (11th Cir. 2021).

Hasan-Nayem appealed to the BIA and challenged the immigration judge's adverse credibility finding, arguing that, under the totality of the circumstances, he had presented a detailed and credible claim of past harm and a well-founded fear of future harm on account of his political opinion and that the adverse credibility finding was not supported by the record.

The BIA upheld the immigration judge's credibility finding on the basis that it was not clearly erroneous and dismissed the appeal. The BIA, citing the immigration judge's order, explained that the immigration judge "properly based her adverse credibility determination on inconsistencies between [Hasan-Nayem's] testimonial and documentary evidence, as well as his in-court demeanor." As to the April 2019 attack, the BIA noted that the immigration judge found that Hasan-Nayem inconsistently described the injuries he sustained. During his credible fear interview, he stated he was stabbed, but omitted that fact during his testimony and in his declaration. And, the BIA explained, the medical record did not reflect a stabbing; rather, it noted a "wound." The BIA rejected Hasan-Nayem's argument that the immigration judge failed to mention the extent of his injuries, noting that the immigration judge considered the totality of the evidence and found inconsistencies in his statements. Further, as to the wound versus stabbing distinction, the BIA explained that it was reasonable for the immigration judge to doubt that the words were synonymous given that the medical report did not use wound synonymously with other injuries like blunt force trauma. The BIA also noted the

immigration judge found that Hasan-Nayem was inconsistent in describing the weapons used during that attack, explaining there were contradictions in his testimony.

The BIA then explained that the immigration judge also found inconsistencies regarding the December attack, e.g., who accompanied Hasan-Nayem to the police station, and rejected Hasan-Nayem's argument that these were minor omissions. The BIA explained that the immigration judge "may base an adverse credibility determination on any inconsistencies in the applicant's statements, without regard to whether they go to the heart of the asylum claim." The BIA further noted that Hasan-Nayem's testimony about his stay at his grandfather's house contradicted his family members' affidavits, all of which omitted that fact. The BIA explained that there were "several plausible explanations for where the respondent could have been when his family said he was away, yet there is no corroborating evidence that he was at his grandfather's house as he claims." And the BIA recognized that the immigration judge had found significant facts omitted from his sister's affidavit, e.g., the AL members showing his photo in Dhaka. While Hasan-Nayem argued that it was because affidavits usually lack such intricate detail, the BIA did not find clear error as to this point. The BIA also noted the immigration judge's finding of inconsistency as to whether Hasan-Nayem's mother had told AL members of his location in Dhaka and determined that the finding was not clearly erroneous.

As to the immigration judge's finding that Hasan-Nayem "was not credible because he was unresponsive to questions asked of him and gave the impression that he was recalling words and phrases he had memorized," the BIA rejected Hasan-Nayem's argument that the immigration judge was not specific enough for him to challenge her demeanor observations. The BIA noted that there were specific instances of evasiveness and nonresponsiveness in the record, citing to specific pages of the hearing transcript. And, as the BIA explained, it deferred to the immigration judge for demeanor observations because she had a unique advantage in determining whether the testimony was true. Finally, the BIA found that the documentary evidence provided was not sufficient to rehabilitate Hasan-Nayem's credibility, given some of it conflicted with his testimony.

Therefore, after considering the totality of the circumstances and all relevant factors, the BIA found that Hasan-Nayem failed to establish that the adverse credibility finding was clearly erroneous and affirmed the denial of the application for asylum and withholding of removal and the denial of CAT relief. This petition for review followed.

## II.    STANDARD OF REVIEW

We review only the BIA's decision, except where "the BIA expressly adopted or agreed with the immigration judge's decision." *Jathursan v. U.S. Att'y Gen.*, 17 F.4th 1365, 1372 (11th Cir. 2021); *see also Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). Additionally, where, as here, the BIA issues an opinion

relying on the immigration judge's decision and reasoning without expressly adopting that decision, we review the immigration judge's decision to the extent that the BIA found the immigration judge's reasoning was supported by the record, and we review the BIA's decision as to issues on which it rendered its own opinion and reasoning. *Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011).

We review the BIA's legal conclusions *de novo*, *Jathursan*, 17 F.4th at 1372, and we review the BIA's factual determinations under the substantial evidence test. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016). Under the substantial evidence test, "we will not disturb an immigration judge's factual findings so long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Jathursan*, 17 F.4th at 1372 (quoting *Lopez v. U.S. Att'y Gen.*, 914 F.3d 1292, 1297 (11th Cir. 2019)); *accord Adefemi v. Ashcroft*, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc). Additionally, "[u]nder the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) ) (alteration in original) (quoting *Adefemi*, 386 F.3d at 1027). And we reverse factual findings "only if the record compels reversal, and the mere fact that the record may support a contrary conclusion is insufficient to justify reversal." *Jathursan*, 17 F.4th at 1372 (quoting *Lopez*, 914 F.3d at 1297); *accord Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1304 (11th Cir. 2009).

"As with other factual findings, '[c]redibility determinations likewise are reviewed under the substantial evidence test.'" *Forgue*, 401 F.3d at 1286 (alteration in original) (quoting *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004)). As to credibility determinations, "[t]he trier of fact must determine credibility, and this court may not substitute its judgment for that of" the BIA and immigration judge with respect to credibility findings. *Id.* (alteration in original) (quoting *D-Muhumed*, 388 F.3d at 818).

## III.   ANALYSIS

In his petition, Hasan-Nayem argues that the BIA erred in affirming the immigration judge's denial of his application for asylum and withholding of removal.[2] Specifically, Hasan-Nayem contends that the BIA erred in affirming the immigration judge's adverse credibility determination, which was based on (1) inconsistencies and omissions between his hearing testimony and documentary evidence in the record and (2) his observed demeanor at the hearing, because it is not supported by substantial evidence.[3] In

---

[2] Hasan-Nayem does not challenge the denial of his application for CAT relief and has therefore abandoned this issue. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

[3] Additionally, Hasan-Nayem raises an "unfair surprise" or lack of notice argument as to the immigration judge's adverse credibility determination about inconsistencies and omissions between his testimony and other evidence in the record. He contends that he was unaware of such inconsistencies and omissions before the immigration judge issued her decision. As the government notes, however, he did not make such an argument before the BIA.

response, the government contends that the record contains substantial evidence that supports the adverse credibility determination.[4]

Under 8 U.S.C. § 1158(b)(1), the Attorney General has discretion to grant asylum to an alien who qualifies as a "refugee." To establish eligibility for asylum, the applicant bears the burden of proving his statutory "refugee" status. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006). To do so, the applicant "must, with specific and credible evidence, establish (1) past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) a well-founded fear of future persecution on account of a statutorily-protected ground." *Id.* To meet his burden, the applicant must offer "credible, direct,

---

Rather, in his brief to the BIA, Hasan-Nayem merely sought to explain or minimize any omissions and inconsistencies between his testimony and the other record evidence. Thus, Hasan-Nayem failed to exhaust this argument before the BIA. And we lack "jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted his administrative remedies with respect thereto." *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006); *accord* 8 U.S.C. § 1252(d)(1). Accordingly, this Court lacks jurisdiction to consider this lack of notice argument.

[4] The government also raises the immigration judge's findings about inconsistences in Hasan-Nayem's testimonial and documentary evidence about the injuries he sustained in the December 2018 attack. But the BIA did not explicitly discuss the immigration judge's findings on this aspect of the December attack. Because the BIA did not expressly adopt or rely on this portion of the immigration judge's decision, we will not review this aspect of the immigration judge's findings. *See Gonzalez*, 820 F.3d at 403.

and specific evidence" into the record.  *Forgue*, 401 F.3d at 1287 (quoting *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997)).

If the applicant's testimony is credible, "it may be sufficient, without corroboration, to satisfy his burden of proof in establishing his eligibility for relief from removal." *Kueviakoe*, 567 F.3d at 1304; *see also D-Muhumed*, 388 F.3d at 818–19.  But an immigration judge's denial of asylum relief "can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence." *Kueviakoe*, 567 F.3d at 1304–05 (citing *Forgue*, 401 F.3d at 1287).

When the immigration judge explicitly determines that an applicant lacks credibility, he "must offer specific, cogent reasons for the finding." *Id.*  In doing so, the immigration judge, considering "the totality of the circumstances, and all relevant factors":

> may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, *without regard to whether an inconsistency,*

*inaccuracy, or falsehood goes to the heart of the ap-*
*plicant's claim*, or any other relevant factor. . . .

8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).  Once the immigra-
tion judge does so, the burden shifts to the applicant to show that
the adverse credibility determination was either not supported by
"specific, cogent reasons" or not based on substantial evidence.
*Chen*, 463 F.3d at 1232 (quoting *Forgue*, 401 F.3d at 1287).  It mat-
ters not if the inconsistencies, omissions, or discrepancies are "triv-
ial" or "irrelevant to the dispositive issues." *Id.* at 1233.  But even
if the immigration judge finds an applicant not credible, the immi-
gration judge still has a duty to consider other evidence produced
by an asylum applicant. *Forgue*, 401 F.3d at 1287.

While the immigration judge and BIA must consider all the
evidence presented by the applicant, they need not "address specif-
ically each claim the petitioner made or each piece of evidence the
petitioner presented." *Carrizo v. U.S. Att'y Gen.*, 652 F.3d 1326,
1332 (11th Cir. 2011) (quoting *Ayala*, 605 F.3d at 948).  They simply
"must consider the issues raised and announce their decision in
terms sufficient to enable a reviewing court to perceive that they
have heard and thought and not merely reacted." *Id.* (quoting
*Ayala*, 605 F.3d at 948).  Further, even where an applicant's expla-
nations for implausible aspects of his claim are tenable—e.g., expla-
nations for inconsistencies and omissions—that alone generally
does not compel a reasonable fact-finder to reverse an adverse cred-
ibility determination. *See Chen*, 463 F.3d at 1233 (noting the lack
of corroborating evidence to support the petitioner's "tenable"

explanations). Indeed, we "must be mindful too that the agency, like any reasonable factfinder, is free to 'credit part of [a] witness' testimony without' necessarily 'accepting it all.' It does not matter whether the agency accepts all, none, or some of the alien's testimony; its reasonable findings may not be disturbed." *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021) (quoting *Banks v. Chi. Grain Trimmers Ass'n*, 390 U.S. 459, 467 (1968)). And when the immigration judge bases an adverse credibility determination on his assessment of the applicant's demeanor, we afford great deference to that assessment, although the determination still must rest on substantial evidence. *Todorovic v. U.S. Atty. Gen.*, 621 F.3d 1318, 1325 (11th Cir. 2010).

For example, in *Xia v. U.S. Att'y Gen.*, 608 F.3d 1233 (11th Cir. 2010), an immigration judge rendered an adverse credibility determination against the petitioner, which was affirmed by the BIA. *Id.* at 1237–38. While the petitioner argued that the adverse credibility determination was not supported by substantial evidence, this Court disagreed, concluding that the immigration judge offered specific, cogent reasons, supported by the record, for the determination such that the record did not compel reversal. *Id.* at 1240–41. In doing so, this Court explained that the immigration judge "listed several discrepancies and omissions that rendered it less than believable," e.g., the petitioner's testimony included "at least one internal inconsistency (how old she was when she had [an] abortion) and one omission (identifying data on the abortion operations certificate)." *Id.* at 1240. This Court also noted that the

petitioner "did not provide corroborating evidence that would have rebutted these inconsistencies and omissions." *Id.*

Applying these standards and reviewing the totality of the record, we conclude that substantial evidence supports the BIA's decision affirming the immigration judge's adverse credibility finding based on inconsistencies and omissions between Hasan-Nayem's hearing testimony and his supporting documentary evidence. For example, as to who accompanied Hasan-Nayem to the police station following the December 2018 attack, Hasan-Nayem testified that both his father and Srabon accompanied him. But Hasan-Nayem's declaration only mentioned that his father accompanied him to the police station; Srabon's affidavit only mentioned that he accompanied Hasan-Nayem to the police station; and his father's affidavit did not state that anyone accompanied Hasan-Nayem. While Hasan-Nayem argues that none of the statements explicitly contradict one another on this topic and that any omissions are not significant, "the mere fact that the record may support a contrary conclusion," *see Jathursan*, 17 F.4th at 1372 (quoting *Lopez*, 914 F.3d at 1297), or that Hasan-Nayem has offered a "tenable" explanation for the inconsistencies, *see Chen*, 463 F.3d at 1233, does not compel reversal. Further, contrary to Hasan-Nayem's argument, it matters not whether the inconsistencies and omissions forming the basis of the adverse credibility determination are "trivial" or "irrelevant to the dispositive issues" so long as they are supported by substantial evidence. *See id.*

Beyond the inconsistencies in the record evidence as to who accompanied Hasan-Nayem to the police station, the other inconsistencies and omissions identified by the immigration judge and the BIA are supported by substantial evidence. For example, Hasan-Nayem testified that no one in his family had informed the AL that he had fled to Dhaka following the April 2019 attack. But his mother attested that she had informed AL members of this fact. While Hasan-Nayem argued to the BIA that "his mother did not technically reveal his location because he was at the hospital" when the AL members asked about Hasan-Nayem, the BIA rejected this argument, concluding that it was not clear error for the immigration judge to find that there were contradictions in the testimony and evidence on this fact, especially when Hasan-Nayem had access to his mother's affidavit before testifying. For similar reasons, we find Hasan-Nayem's argument unavailing—even if his explanation is "tenable," substantial evidence nonetheless supports the BIA's finding.

These inconsistencies and omissions alone are "specific, cogent reasons," supported by the record, for the adverse credibility determination against Hasan-Nayem. *See Xia*, 608 F.3d at 1240. But we note that the BIA and immigration judge found further inconsistencies and omissions as to (1) the nature of the weapon used against Hasan-Nayem and the type of injuries he suffered in the April 2019 attack, (2) Hasan-Nayem's location in the time between the December 2018 and April 2019 attack, and (3) the AL showing a photograph of Hasan-Nayem around Dhaka after the April 2019

attack.  While Hasan-Nayem offers tenable explanations for these inconsistencies and omissions, those explanations are not enough to compel reversal of the adverse credibility finding where, as here, substantial evidence supports those additional findings of the BIA and the immigration judge.  *See Chen*, 463 F.3d at 1233.

Finally, the immigration judge partially based her adverse credibility determination on her assessment of Hasan-Nayem's demeanor at the hearing as evasive and nonresponsive, stating that he "gave the impression at times that he was recalling words or phrases that had been memorized rather than describing events fully as they actually happened to him."  We have explained that the immigration judge "alone is positioned to make determinations about demeanor—by observing the alien and assessing his or her tone and appearance—and in that sense is 'uniquely qualified to decide whether an alien's testimony has about it the ring of truth.'" *Todorovic*, 621 F.3d at 1324 (quoting *Abdulrahman v. Ashcroft*, 330 F.3d 587, 597 (3d Cir. 2003)).  While Hasan-Nayem contends that the immigration judge's demeanor analysis failed to cite specific examples, the BIA, in affirming the immigration judge's decision, found that there were several instances of evasiveness and nonresponsiveness in the record, e.g., when the immigration judge interrupted Hasan-Nayem's testimony while he was looking down at his hands when responding to questions from counsel.  Thus, there is substantial evidence in support of the demeanor determination.  *See id.* at 1325.

In sum, the immigration judge and the BIA offered "specific, cogent reasons," supported by substantial evidence in the record, for determining that Hasan-Nayem's testimony was not credible, and this record does not compel us to reverse that adverse credibility determination.  *See Xia*, 608 F.3d at 1240–41.  Accordingly, we affirm the BIA's decision and deny Hasan-Nayem's petition for review.

## IV.    CONCLUSION

For these reasons, we deny Hasan-Nayem's petition for review.

**PETITION DENIED.**