[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-10471

_____

IGNACIO BALAEZ SERRA,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A213-218-830

_____

Before WILSON, JILL PRYOR, Circuit Judges, and RUIZ,[*] District Judge.

RUIZ, District Judge:

For decades, the authoritarian regime in Cuba has utilized its police force to intimidate and physically assault political dissidents and peaceful demonstrators throughout the island.[1] Ignacio Balaez Serra, a Cuban immigrant seeking asylum in the United States, maintains he experienced this abuse first-hand after multiple arrests, imprisonments, and beatings by the Cuban police.

Serra seeks review of the Board of Immigration Appeals' ("BIA") final order affirming the Immigration Judge's ("IJ") denial of Serra's application for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel Inhumane or Degrading Treatment or Punishment ("CAT") (together, "Application"). The IJ denied Serra's Application, finding Serra's testimony "not credible."

In reaching this adverse credibility determination, the IJ cited two inconsistencies between Serra's hearing testimony and

---

[*] Honorable Rodolfo A. Ruiz II, United States District Judge for the Southern District of Florida, sitting by designation.

[1] *See* U.S. Department of State, 2021 Country Reports on Human Rights Practices: Cuba (2021), https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/.

Application.  The first purported inconsistency dealt with the timing of Serra's passage of a kidney stone; specifically, whether he passed it on the day he was beaten by Cuban police or several days thereafter.  The second pertained to the number of countries Serra passed through en route to the United States; he listed ten countries in his written Application but later testified that he traveled through "about 11 or 12."  The IJ also reached his adverse credibility determination based on Serra's perceived non-responsiveness to certain questions.  On appeal, the BIA rejected the IJ's finding that Serra was non-responsive but affirmed the IJ's adverse credibility determination based on the two inconsistencies alone.

After careful review and with the benefit of oral argument, we conclude the record lacks substantial evidence that would allow us to affirm the adverse credibility determination.  We therefore reverse and remand.

## I.

Serra first arrived at the United States border in Presidio, Texas, on November 6, 2019, to seek asylum.  Throughout the asylum process, Serra had three opportunities to explain his basis for seeking asylum.  Serra was initially questioned by an immigration official during a "credible fear interview."  Then, after an officer determined Serra's fear was credible, he filled out a written Application for asylum.  And once Serra submitted his Application, he testified before an IJ in a final hearing on the merits.  Serra described his life prior to his arrival in the United States on all three occasions.  The following facts are derived from these submissions.

Serra claims he was, and continues to be, in severe danger in Cuba due to his political beliefs.  This danger stems from Serra's two-year mandatory military service beginning at age seventeen.  While enlisted, Serra was imprisoned for approximately one year after he stopped appearing for military service following complaints to his superiors about mistreatment in the military.  Serra contends that as a result, he was labeled a counter-revolutionary.  Beginning in 2017, years after this initial incarceration in Cuba, he was imprisoned three more times for, in Serra's opinion, failure to participate in mandatory political activities and because Regla, his home municipality, is known for counter-revolutionary activity.[2]

During these periods of incarceration, Serra was physically and verbally assaulted by the Cuban police.  Serra claimed that on one occasion he was arrested near his house and detained at a police station for four days.  Serra reported that during this detention the police hit him with batons, broke his tooth on a bar, and kicked him in his ribs.  As a result of this beating, Serra passed a kidney stone.  The report from Serra's credible fear interview indicates he passed the kidney stone on the day the police kicked him.

Shortly thereafter, Serra decided to leave Cuba.  Serra, with his son and his son's mother, traveled to the United States from

---

[2] Specifically, Serra described Regla "as the most worm municipality in Cuba." The term "worm," or *gusano*, was used by Fidel Castro to describe counter-revolutionaries, but is now embraced by the opposition to the authoritarian regime in Cuba.

Cuba over the course of two years, which included: (1) a one-year stay in Bolivia, (2) travel by land from Bolivia to Mexico, and (3) a seven-month stay in Mexico.

When Serra arrived at the United States border, he was taken into custody and later given an I-870 credible fear interview to determine his eligibility to file for asylum. Serra received a positive credible fear determination on February 5, 2020. That same day, the Department of Homeland Security ("DHS") served him with a Notice to Appear that charged him with removal pursuant to Section 212 of the INA, 8 U.S.C. § 1182. Serra subsequently submitted an I-589 Application for asylum, where, for the second time, he provided information regarding his background and reasons for seeking asylum.

On July 20, 2020, Serra appeared *pro se* at a merits hearing via tele-video. At the hearing, Serra provided testimony in response to questions from the IJ and a DHS attorney, recounting his background and reasons for seeking asylum for a third time. The IJ asked Serra how the Cuban police officers beat him and whether they did anything else to him. As part of Serra's response, he testified, "I released a kidney stone the size of a one-centimeter kidney stone." The IJ asked Serra, "you released a kidney stone while they were beating you? I just want to make sure I understand that. And can you tell me how that happened?" At that point, the interpreter asked the IJ for "permission to inquire." Then, Serra responded, "[n]o, no, no, no. This, this was days after when I released that kidney stone." Additionally, the IJ asked about the countries Serra

traveled through before he arrived in the United States, and Serra responded, in part, "[i]t was about 11 or 12 countries in total."

Serra did not present any other witnesses or documentary evidence in support of his claims. Thus, the record before the IJ consisted of the Notice to Appear, the summary of Serra's credible fear interview, Serra's written Application and supplements to it, and Serra's testimony.

The IJ issued an oral ruling at the conclusion of the hearing. The IJ found Serra's testimony was not credible and that Serra did not otherwise corroborate his claims. The IJ therefore denied Serra's Application. In support of the IJ's finding that Serra was not credible, the IJ held that Serra's testimony was inconsistent with his prior statements to immigration officers and his written Application. First, the IJ held it was inconsistent for Serra to indicate that "he passed a kidney stone on the day he was kicked by the police officers" in his I-870 credible fear interview but later testify that "he did not pass the kidney stone until seven days after being arrested." Second, the IJ stated that it was inconsistent for Serra's I-589 Application to "list[] 10 countries that he passed through prior to his entry into the United States" but for Serra to testify "to 11 or 12 countries that he passed through."

Additionally, the IJ "note[d]" Serra was "non-responsive to questions asked by the Court as well as questions asked by DHS Counsel." Specifically, the IJ found Serra to be non-responsive when questioned about whether he received medical attention after he was released from jail. The IJ concluded, "as the respondent

is not credible, he has to corroborate his claims under the REAL ID Act of 2005. Since he has not provided sufficient corroborations [sic] for his claims made in the I-589 [Application] and his in-court testimony, his applications for relief are hereby denied." After delivering the oral decision, the IJ stated, "I'm going to now give a longer decision. I just wanted to go ahead and advise you first of what my decision will be. I'm going to ask that you be patient while I put the Court's decision on the record." However, the only written decision is a verbatim reproduction of the oral ruling.

Serra appealed to the BIA. The BIA affirmed in part, holding "[b]ased on the totality of the circumstances we decline to disturb the Immigration Judge's ultimate adverse credibility determination." Addressing the IJ's finding of two inconsistencies, the BIA concluded, "we are unpersuaded by the respondent's appellate arguments that the Immigration Judge committed clear error in making his findings in this regard." However, addressing the IJ's finding of non-responsiveness, the BIA held the IJ "clearly erred in specifically finding that [Serra] was non-responsive as to whether he actually sought medical attention after his May 2017 arrest." Thus, while the IJ's adverse credibility determination was initially based on four examples in the record, the BIA's affirmance hinges only on Serra's purportedly inconsistent testimony regarding his kidney stone and the countries through which he traveled.[3]

---

[3] In response to Serra's argument that the IJ should have given him an opportunity to explain inconsistencies in his testimony, the BIA also observed, "the

8                    Opinion of the Court                    21-10471

## II.

We generally review decisions of the BIA only. *Jathursan v. U.S. Att'y Gen.*, 17 F.4th 1365, 1372 (11th Cir. 2021). But where, as here, the BIA issues a decision relying in part on the IJ's reasoning, we review both decisions. *Id.*

In reviewing the IJ and BIA's decisions, we review legal conclusions de novo and factual findings under the "substantial evidence" test. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005). That means we will only disturb the IJ and BIA's factual findings if they are not supported by "reasonable, substantial, and probative evidence" when considering the entire record. *Jathursan*, 17 F.4th at 1372. "The IJ's factual determinations, including credibility determinations, are reviewed under a substantial evidence standard, which provides that the IJ's decision can be reversed only if the evidence compels a reasonable fact finder to find otherwise." *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1230–31 (11th Cir. 2006) (citation omitted). "We review the record evidence in the light most favorable to the agency's decision and draw

---

United States Court of Appeals for the Eleventh Circuit has not directly addressed in a precedential opinion whether an Immigration Judge must provide an asylum applicant an opportunity to explain discrepancies that form the basis of an adverse credibility finding." Thus, the BIA did not require that the IJ provide Serra with an opportunity to explain the purported inconsistencies upon affirming the denial of Serra's Application. Because we reverse for lack of substantial evidence, we need not reach this issue.

all reasonable inferences in favor of that decision." *Recinos v. U.S. Att'y Gen.*, 566 F.3d 965, 967 (11th Cir. 2009) (alteration adopted).

## III.

Serra argues that the BIA's decision affirming the IJ's denial of his Application is not supported by substantial evidence. Specifically, Serra avers the BIA erred in holding that the two purported inconsistencies between his hearing testimony and other written statements support an adverse credibility determination. In response, the Government argues that the IJ may rely on any inconsistency, so these particular discrepancies are sufficient to support the adverse credibility determination at issue. Moreover, the Government argues Serra's credible fear interview answers and merits hearing testimony "materially diverged," and Serra failed to provide any documentary evidence.

Serra seeks three forms of relief: asylum, withholding of removal under the INA, and withholding of removal under CAT. The Attorney General has discretion to grant asylum to an applicant who qualifies as a "refugee." 8 U.S.C. § 1158(b)(1). To establish "refugee" status, the applicant must establish "(1) past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) a well-founded fear of future persecution on account of a statutorily-protected ground." *Hasan-Nayem v. U.S. Att'y Gen.*, 55 F.4th 831, 843 (11th Cir. 2022) (citing *Forgue*, 401 F.3d at 1287). "To meet [this] burden, the applicant must offer 'credible, direct, and specific evidence' into the record." *Id.* Similarly, under the INA, "the Attorney General

may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). And to obtain CAT relief, an applicant must show that it is more likely than not that the applicant would be tortured if removed to the proposed country of removal. 8 C.F.R. § 208.16(c).

To obtain all three types of relief, "[t]he testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii); *see also* 8 U.S.C. § 1231(b)(3)(C); 8 C.F.R. § 208.16(c)(2). Accordingly, oral testimony at a merits hearing can be sufficient on its own to meet the applicant's burden. If the IJ explicitly determines that the applicant lacks credibility, the IJ must provide "specific, cogent reasons for the finding." *Forgue*, 401 F.3d at 1287. The burden then shifts to the applicant to show that the credibility decision was either not supported by "specific, cogent reasons" or was not based on "substantial evidence." *Id.*

The REAL ID Act of 2005 amended our pre-existing asylum statutory scheme, in part, to instruct IJs on how to properly determine credibility during removal proceedings. The REAL ID Act created a "totality of the circumstances" standard, requiring IJs to

consider "all relevant factors" before reaching a conclusion as to credibility. 8 U.S.C. § 1158 (b)(1)(B)(iii). The statute states:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor . . . .

*Id.* Thus, the plain language of the REAL ID Act grants IJs broad discretion when making credibility determinations. This broad discretion is crucial since the IJ is best positioned to observe live testimony from the applicant and witnesses. *See Todorovic v. U.S. Att'y Gen.*, 621 F.3d 1318, 1324–25 (11th Cir. 2010).

Notably, however, such discretion is not without limitation. The statute requires IJs to evaluate testimony and consider inconsistencies, omissions, or contradictions not in isolation, but in light of the "totality of the circumstances, and all relevant factors." 8

U.S.C. § 1158 (b)(1)(B)(iii). This language prevents an IJ from cherry picking certain facts favoring an adverse credibility determination or excessively focusing on insignificant testimonial inconsistencies to ascertain a lack of credibility. And although the statute broadly permits IJs to consider "the consistency between the applicant's or witness's written and oral statements," IJs must nevertheless "consider[] the circumstances under which the statements were made." 8 U.S.C. § 1158 (b)(1)(B)(iii). Moreover, the IJ "must consider the issues raised and announce their decision in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." *Hasan-Nayem*, 55 F.4th at 844.

Our precedent distinguishes between credibility determinations based on demeanor versus those that are not. The former are "largely unreviewable." *Todorovic*, 621 F.3d at 1325. We have long recognized that an IJ possesses a unique perspective as the only adjudicator who personally observes an asylum-seeker's testimony. *See id.* at 1324. However, credibility determinations that do not rely on demeanor must "rest on substantial evidence, rather than conjecture or speculation." *Id.* at 1235. Here, neither remaining reason supporting the IJ's adverse credibility determination involves an evaluation of Serra's demeanor, or any other factors that require first-hand observation. So, we consider whether the two reasons given are supported by substantial evidence.

For guidance, we turn to two relevant cases that apply the REAL ID Act to determine whether "substantial evidence" exists.

In *Kueviakoe v. U.S. Attorney General*, we considered whether three perceived inconsistencies between hearing testimony and previous statements justified the denial of an asylum application. 567 F.3d 1301, 1305 (11th Cir. 2009). The perceived inconsistencies we considered were (1) Kueviakoe's use of the words "truck" and "car" in the credible fear interview and hearing testimony respectively, to describe the same vehicle; (2) a discrepancy between Kueviakoe's credible fear interview statement that he was "arrested and tortured for two days," and his testimony that he was only beaten on the first day of his two-day imprisonment; and (3) a discrepancy in the timeline of Kueviakoe's hospitalization and treatment in his written application and hearing testimony. 567 F.3d at 1305–06. We held that the record "compel[ed]" us to reverse because the three "identified inconsistencies were not sufficient to support a finding of lack of credibility because they were not inconsistencies at all; that is, no reasonable fact-finder could conclude on this record that they were inconsistencies." *Id.* at 1305.

Our analysis regarding the use of the words "truck" and "car" to describe the same vehicle is instructive here. We held, "[w]e do not see an inconsistency of any importance in the word choice." *Id.* One reason for that conclusion was, "Kueviakoe's words, in both cases, were translated from French, suggesting that he was not the one making the word choice." *Id.* Our second and "[m]ore significant[]" reason, was that "in both instances, all of the other pertinent information remained the same." *Id.* We

elaborated, "with respect to his comment about having been dragged to a car, he stated that ten people were with him in the vehicle." *Id.* From this we concluded, "[t]here is no plausible and material inconsistency between a 'car' accommodating ten people and a 'truck' accommodating ten people." *Id.* In other words, it is not as though Kueviakoe testified first that he was dragged into a car with three people and later that it was a truck filled with dozens of people. A third reason this did not support the adverse credibility determination was because in Kueviakoe's first statement, he "described the vehicles that the military and police arrived in as 'trucks' and then later as 'cars,'" which we held demonstrated "a failure to distinguish between the two words." *Id.* We concluded, "[s]imply put, a reading of the record compels the conclusion that this difference in terminology is wholly immaterial." *Id.*

Next, we consider our opinion in *Tang v. U.S. Attorney General*, where we again reversed an IJ's adverse credibility determination. 578 F.3d 1270 (11th Cir. 2009). There, as here, the IJ initially provided four reasons to support the adverse credibility determination, the BIA rejected two of them, and we considered the remaining two. Of the remaining two, the basis for one adverse credibility determination was that the applicant's "statements about whether she was 'Christian' prior to joining an underground family church in China were inconsistent." *Id.* at 1278. We noted that when an IJ "considers the circumstances" under which statements are made (as required by the REAL ID Act), the IJ should consider the variables in play when the statements were given.

Specifically, "the IJ found inconsistencies between Tang's testimony at her airport interview and her testimony at her credible fear interview and asylum hearing with regard to her early Christian experience. The IJ concluded that Tang was inconsistent because she did not mention her [early-life] Catholic-church attendance during her airport interview." *Id.* In other words, Tang's hearing testimony provided more information than her initial statement. But we held that the "IJ should note that during an airport interview, unlike in a hearing with full due process accorded, the alien . . . may be markedly intimidated by official questioning, particularly if the alien has indeed been subject to government abuse in her country of origin." *Id.* at 1279. Further, we concluded, "[a]lthough [Tang's] hearing testimony was more in depth, she said nothing that cannot be squared with her earlier statements. Again, on these facts, that which the IJ considered an inconsistency, we identify only as a helpful elaboration." *Id.* at 1280.

With these examples in mind, we turn to the bases for the IJ's adverse credibility determination against Serra.

### A. Kidney Stone

First, the IJ concluded that it was inconsistent for Serra to indicate that "he passed a kidney stone on the day he was kicked by the police officers" in his I-870 interview, but later testify that "he did not release the kidney stone until seven days after being arrested." Serra's statement in his credible fear interview about passing a kidney stone is found in a (1) summary of the interview; (2) written by an immigration officer after questioning Serra; (3)

through a Spanish-speaking interpreter.  The document itself states it is "not a verbatim transcript."  Indeed, it is rife with errors.  The I-870 interview reflects the following exchange about the second occasion that Serra was arrested:

> Q: Where were you the second time?
>
> A: I was sitting below my house.
>
> Q: How [sic] hurt you second time?
>
> A: They hit me with the batons, put my head in the bar.  They broke my tooth, my mouth.  They put me in jail.  They were hitting me all the time.  The [sic] stuck my head between the bars in the cell.  I passed a kidney stone that day, because of the kicks they gave me.
>
> Q: Do anything else to you?
>
> A: That day, nothing else.
>
> Q: Did you have any injuries?
>
> A: That night, I had colleagues [sic] because of my kidney stone.
>
> Q: Did you have any injuries besides the kidney stone?
>
> A: No injuries other than they broke my tooth and my whole face was swollen.

This was the only line of questioning in the I-870 interview that addressed the second time Serra was harmed by the police. The I-870 interview did not address whether Serra received medical attention, where he was when he released the kidney stone, or what happened when the stone was released.

Months later, at the merits hearing, the IJ asked Serra about this incident. The IJ asked Serra, "when you say they beat you, what do you mean by beat? Or how did they beat you?" Serra answered,

> Well, okay. From the office, that's where they began to beat me. And, well, after that, the captain said to the dungeon. Take him to the dungeon. And well, I was taken. I was, they took me to the dungeon and then, well, there, you see, there's this somewhat of a, these bars or a fence there where they pressed my face against it and, well, I, that's where I broke my tooth right here. You see this tooth right here. I broke it. And then this other one over here too. Two of them. Two of them are broke. And, well, my head. My head became swollen as well.

Then the IJ asked, "did they do anything else to you?" Serra answered,

> Once in the dungeon, well, I mean, I was on the floor, and they kicked me. It's unfortunate that I cannot show you exactly or prove to you exactly how they did that. I can, however, tell you that I released a kidney stone the size of a one-centimeter kidney stone.

> And well, my ribs as well. I mean I was bleeding out
> of my mouth. My head.

Then the IJ asked, "you released a kidney stone while they were beating you? I just want to make sure I understand that. And can you tell me how that happened?"

At that point, the interpreter stated, "Your honor, this is the interpreter. May the interpreter inquire?" The IJ said "yes." The record next reflects that Serra answered,

> No, no, no, no. This, this was days after when I re-
> leased that kidney stone. You see, I suffer from
> chronic stones or kidney stones. It's basically, it, your
> kidney releases this through the conduct of your body
> until it reaches the bladder. And I, I was asking them
> to take me to a doctor.

Then the IJ asked, "did they take you, did the police take you to the doctor?" Serra responded, "they didn't want to take me."

The IJ asked, "after you were released after those four days, did you seek medical attention at all?" Serra responded,

> Well, on day six, I was still a bit, well, I'm still recu-
> perating in May and on day seven, I will never forget.
> Day seven, May 7th, around 9:00 or 10:00 in the
> morning, I could not urinate. I knew I had that kid-
> ney stone and well, I was drinking water and I could
> not pee. Apparently, the stone had lodged in my ure-
> thra.

21-10471                Opinion of the Court                19

The IJ then asked, "[a]gain, I'm going to ask you the same question I asked you before. Did you seek medical attention after you were released?" Serra responded, "[o]n day seven, on day seven, I went to the doctor because my urinary tract was clogged or was backed up because of the one-centimeter kidney stone had been lodged in my urethra."

We conclude that based on this record, there is not "substantial evidence" to support the IJ's conclusion that Serra's statements about his kidney stone support an adverse credibility determination. *See Chen*, 463 F.3d at 1231.

To begin, the pertinent information about Serra's beating by the Cuban police remained the same from the I-870 interview to the hearing testimony. On both occasions Serra reported being hit with batons, that his head was put between bars in a jail cell which broke his tooth and hurt his mouth/face, and that he was kicked, which caused him to pass or release a kidney stone. In *Kueviakoe*, we explained that the "[m]ore significant[]" reason the discrepancy was not supported was that the applicant was consistent in re-telling the story of being dragged to the vehicle, such that the inconsistency was "wholly immaterial" to his credibility. 567 F.3d at 1305. So too is the passage of the kidney stone—the timing of the release of the stone from Serra's body is immaterial given the consistent description of his abuse at the hands of the Cuban police.

Further, as in *Tang*, Serra's explanation of the kidney stone incident is more elaborate than the information he initially provided because he was asked additional questions about it. In the I-

870 interview, Serra was only asked: "How [sic] hurt you second time," "do anything else to you," and "did you have any injuries?" However, when Serra was asked additional questions about the kidney stone during the hearing, he provided more detail, such as how much time it took for the kidney stone to be released from his body and when he sought medical attention.

Finally, as in *Kueviakoe*, the record indicates that language and interpretation barriers existed in relation to the kidney stone issue. The record shows an inconsistent use of the verbs "pass" and "release" regarding Serra's kidney stone. In the I-870 interview, Serra reportedly said "I *passed* a kidney stone." Then, at the hearing, Serra instead repeatedly used the term "*released*." It is unclear whether Serra affords different meaning to these terms (*e.g.*, a kidney stone passes through one's body for several days before it is ultimately released from the body). In both instances, Serra spoke through a Spanish interpreter. And at the pivotal point in the hearing transcript upon which the IJ determined Serra was inconsistent about his kidney stone, the record shows that the interpreter needed clarification.

Considering the totality of the circumstances in light of these concerns, we cannot conclude that Serra's two translated statements about passing or releasing a kidney stone after he was kicked in the ribs by the Cuban police support the adverse credibility determination reached by the IJ. When an IJ considers inconsistencies, the REAL ID Act requires "consider[ation of] the circumstances under which the [inconsistent] statements were made." 8

U.S.C. § 1158 (b)(1)(B)(iii).  The IJ did not do so here.  On these facts, we are compelled to find that there is not substantial evidence to sustain the IJ's determination.

## B.  Geography

We now turn to the other purported inconsistency—the number of countries Serra traveled through before arriving at the United States border.  In his ruling, the IJ only noted that Serra "listed 10 countries" on his I-589 Application but then "testified to 11 or 12 countries that he passed through" at the hearing.  The IJ relied in part on this purported inconsistency in making his adverse credibility determination.  The BIA affirmed this ruling, holding that the IJ did not commit clear error in making his findings.

We disagree with the BIA's affirmance.  The record shows that at the hearing, Serra provided an approximation: "[i]t was about 11 or 12 countries in total."  The fact that he qualified the number indicates that he was estimating.  After Serra provided an estimate, the IJ let the approximation stand.  Given that the standard the IJ used to measure Serra's credibility on this point was one of approximation, the substantial evidence standard compels us to reverse the IJ's adverse credibility determination.  Serra's estimate of "about 11 or 12," compared to a list of countries provided on his I-589 Application almost two months before his merit hearing is simply immaterial to his credibility, and "a reasonable fact finder" would not conclude otherwise.  *See Chen*, 463 F.3d at 1230–31 (citation omitted).  Therefore, as with the IJ's ruling regarding Serra's

kidney stone, we conclude the IJ committed clear error in reaching an adverse credibility determination.

## IV.

In sum, the IJ perceived two instances of non-responsiveness and two discrepancies in the record, resulting in an adverse credibility determination. The BIA rejected the IJ's findings of non-responsiveness. Thus, the IJ's adverse credibility determination hinged only on two purported inconsistencies in the record. But upon consideration of the totality of the circumstances, it is clear these inconsistences are unsupported by reasonable, substantial, and probative evidence—and thus cannot form the basis for an adverse credibility determination.

Therefore, we grant Serra's petition. We further vacate the BIA's decision and the IJ's opinion and remand this case to the IJ to rule on Serra's applications for asylum, withholding of removal, and relief under CAT in accordance with this opinion. In doing so, the IJ must ensure that all relevant factors are considered—and the totality of the circumstances ascertained—before reaching a conclusion as to credibility.

**PETITION GRANTED, VACATED** and **REMANDED**.